**[Cite as *In re C.R.*, 2020-Ohio-5208.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: C.R.

:
:
:     Appellate Case No. 28842
:
:     Trial Court Case No. 2018-3911
:
:     (Appeal from Common Pleas
:     Court – Juvenile Division)
:
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of November, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Appellee MCCS

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
     Attorney for Appellant Mother

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted legal custody of her son, C.R., to Maternal Grandparents. For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 2} C.R. was born in March 2018. Four days later, Montgomery County Department of Job and Family Services - Children Services Division ("MCCS") received a referral, alleging that Mother drank alcohol during her pregnancy with C.R. and was struggling to care for C.R. MCCS received a report that, while in the hospital, Mother had dropped C.R. in a bassinet, causing the child's head to hit the sides of the bassinet. There were additional concerns that Mother was not feeding the child enough and was not caring for him properly. MCCS was informed that Mother had been diagnosed with bipolar disorder and depression and had a history of mental health issues.

{¶ 3} MCCS filed a complaint in Montgomery J.C. No. 2018-2619 and created a case plan for Mother. Case No. 2018-2619 could not be adjudicated within the statutory time period, and on August 7, 2018, MCCS filed the instant complaint. MCCS requested temporary custody to Maternal Grandparents, with whom C.R. has lived since birth. The trial court appointed a guardian ad litem (GAL) and counsel for mother.

{¶ 4} On October 30, 2018, the magistrate held a dependency hearing at which Mother, Father, and Maternal Grandparents appeared. The court adjudicated C.R. to be dependent. Upon the recommendation of the GAL and with the agreement of the parties, the magistrate granted temporary custody of C.R. to Maternal Grandparents, with the

order to expire in one year.

{¶ 5} On July 25, 2019, MCCS filed a motion for legal custody to Maternal Grandparents. On August 13, 2019, Mother filed a motion for reunification of C.R. with Mother, with protective supervision to MCCS. After several continuances for various reasons, the magistrate held a hearing on the motions on January 17, 2020. MCCS offered three witnesses: MCCS Caseworker Heather Prince; Dr. Rhonda Lilley, a clinical psychologist; and Maternal Grandmother. Mother testified on her own behalf. Father appeared with counsel and informed the trial court that he was in agreement with MCCS's motion for legal custody to Maternal Grandparents.

{¶ 6} On January 21, 2020, the magistrate denied Mother's motion for reunification and granted legal custody of C.R. to Maternal Grandparents, finding that legal custody to them was in C.R.'s best interest. The magistrate granted Mother supervised parenting time with C.R.; Father received parenting time as agreed by the parties.

{¶ 7} Mother objected to the magistrate's decision, arguing that several of the magistrate's findings were based on insufficient evidence and against the manifest weight of the evidence. Specifically, Mother challenged the magistrate's conclusions that Mother's mental health issues affected her ability to demonstrate appropriate parenting skills, that she had not consistently addressed her mental health issues, that she had made threats to burn down a home with Maternal Grandparents and C.R. inside, that Mother's mental health issues prevented her from providing a safe and appropriate home, and that legal custody to Maternal Grandparents was in C.R.'s best interest.

{¶ 8} On June 24, 2020, in a lengthy decision, the trial court reviewed the evidence presented at the dispositional hearing and the relevant law. The trial court concluded

that legal custody to Maternal Grandparents was in C.R.'s best interest. Accordingly, the trial court overruled Mother's objections, overruled Mother's motion for reunification, and granted MCCS's motion for legal custody to Maternal Grandparents. The court granted supervised parenting time to Mother and parenting time to Father as agreed by the parties.

{¶ 9} Mother appeals from the trial court's ruling. Her sole assignment of error claims that the trial court erred when it granted legal custody of C.R. to Maternal Grandparents.

## II. Standard for Grant of Legal Custody

{¶ 10} An award of legal custody "vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21); *see In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 8. Unlike an award of permanent custody, however, "[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus.

{¶ 11} R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]" A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest

of the child. *In re C.B.*, 2d Dist. Montgomery No. 28113, 2019-Ohio-890, ¶ 17, citing *In re M.O.*, 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7.

{¶ 12} When making a legal custody determination under R.C. 2151.353, the juvenile court must apply the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). *In re A.F.*, 2018-Ohio-310, 103 N.E.3d 1260, ¶ 52 (2d Dist.), citing *In re D.S.* at ¶ 9; *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589 (1992), paragraph two of the syllabus; R.C. 2151.23(F)(1). The factors a court must consider in determining a child's best interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. *In re A.F.* at ¶ 52.

{¶ 13} An appellate court will not reverse an award of legal custody absent an abuse of discretion by the juvenile court. *Id.* The term "abuse of discretion" implies that the juvenile court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### III. Best Interest of C.R.

{¶ 14} In her sole assignment of error, Mother claims that the juvenile court erred in granting legal custody to Maternal Grandparents. She argues that custody should have been given to her or she should have been given more time to complete her case plan objectives. We infer from Mother's arguments that she believes that the grant of legal custody of C.R. to Maternal Grandparents was not in C.R.'s best interest.

{¶ 15} The evidence at the January 17, 2020 hearing was as follows.

{¶ 16} Maternal Grandmother testified that C.R. had been residing in her home since he left the hospital following his birth; C.R. was 22-months old when the hearing occurred. Also residing in the home were Maternal Grandfather, C.R.'s 14-year-old twin uncles, his 21-year-old aunt, and his 15-month-old cousin. Maternal Grandmother stated that C.R. had a "very strong bond" with the family. He and Maternal Grandfather were "two peas in a pod when they're together" and C.R. attended the twins' multiple sporting events. Maternal Grandmother stated that C.R. loved to go to their sporting events and mimicked them at home. C.R. also liked to play with his blocks and throw balls. He enjoyed spending time with his babysitter. Maternal Grandmother testified that the family ate meals together, and she and Maternal Grandfather read to C.R. and played with him.

{¶ 17} Maternal Grandmother described C.R.'s daily routine. She said that C.R. eats breakfast while his uncles are getting ready for school. On days that Maternal Grandmother works, he goes to a sitter for about five and a half hours. Maternal Grandmother picks him up, and they either go home and play or go to an uncle's sporting event. On days that Maternal Grandmother does not work, they run errands and attend appointments for different services for C.R. Maternal Grandmother stated that C.R. had some developmental delays, including speech and movement delays. C.R. received services through Help Me Grow and the PACE Program. C.R.'s bedtime routine included brushing his teeth and taking a bath.

{¶ 18} When asked about the food C.R. likes, Maternal Grandmother stated that C.R. eats "anything and everything. He's never shown a dislike to anything we've offered him." Maternal Grandparents prepare dinner for C.R.; he will eat chicken, beef,

vegetables, fruit, "pretty much anything."

**{¶ 19}** Maternal Grandmother stated that C.R. has opportunities to play with children his own age while at the sitter's home. While there, he plays with blocks and other toys and does art activities.

**{¶ 20}** Maternal Grandmother indicated that on several occasions after C.R. was born, when Mother was also living with Maternal Grandparents, Mother had threatened them, threatened to blow up their house, cursed at them, and called the Sheriff's Office on them.

**{¶ 21}** Maternal Grandmother stated she supervised Mother's visitation with C.R., and the visits occurred at "off-site" locations. Maternal Grandmother indicated that visitation had occurred at her home for a while, but stopped in early August 2019, after the Sheriff's Office was called to remove Mother from their home due to her behavior. Maternal Grandmother also indicated that, on August 30, 2019, Mother had threatened to burn down Maternal Grandparents' house with C.R. in it.

**{¶ 22}** Mother had visitation with C.R. at Help Me Grow, where they worked with Mother on parenting techniques. Visitation also occurred at the Dayton Mall. Maternal Grandmother stated that C.R. would walk or crawl at the play areas, but more typically, Mother pushed him around in a stroller. Maternal Grandmother stated that C.R. had used the word "mama" around Mother, but Maternal Grandmother was not sure that he was "understanding her [Mother's] position"; Maternal Grandmother stated that "you'll hear him just making the sound."

**{¶ 23}** Maternal Grandmother stated that during summer 2019, Mother had four-hour visitation, but was sometimes late and often left early. Since December 1, 2019,

Mother had eight opportunities for visitation, but only came to three of them. Some of the missed visits were due to illness and a couple times Mother missed the bus. One time was a no-show, but Mother usually texted on the night before the scheduled visitation or a couple of hours before. Mother had last visited with C.R. at Help Me Grow during the week before the hearing.

{¶ 24} Maternal Grandmother indicated that she and her husband had "made lots of adjustments in our schedules to facilitate [Mother's]." (Tr. at 21.) Maternal Grandmother said that they facilitated visitation by either picking Mother up and dropping her off at her apartment (when she lived nearby) or a bus stop. No visitations had occurred at Mother's home.

{¶ 25} Maternal Grandmother expressed concerns about Mother's visits with C.R. She testified that, when C.R. was younger, Mother seemed to get frustrated when C.R. was fussy or upset and did not know how to handle it. Maternal Grandmother further testified that, more recently, Mother had "tried to discipline [C.R.] for things that children of his age do; and they've been rather abrupt. And when I tried to explain to her [Mother] that he's not used to being disciplined in that way I get shut down very fast." (Tr. at 19.) Maternal Grandmother indicated that she had tried to work with Mother on some things, and Mother sometimes took her advice and sometimes not.

{¶ 26} Maternal Grandmother testified that Father had weekly visitation, and she had no concerns about Father's interactions with C.R. Maternal Grandmother stated that visitation with Father usually occurred at Maternal Grandparents' home, but visits had also occurred at Paternal Grandparents' house. If legal custody were granted to Maternal Grandparents, Maternal Grandmother envisioned that visitation would continue

with Father "pretty much as it is now" and that Father eventually "would be able to take [C.R.] places and do things with him."   (Tr. at 25.)

{¶ 27} Maternal Grandmother testified that she and her husband would like legal custody of C.R.

{¶ 28} Dr. Rhonda Lilley testified regarding her evaluations of Mother in August and October 2018.   Dr. Lilley used the Minnesota Multiphasic Personality Inventory (MMPI), the Parenting Stress Inventory, the Rotter Incomplete Sentences Blank, and a parent/child observation.   Dr. Lilley stated that her evaluation was focused on Mother's emotional health; she did not do an intellectual assessment, because there were no indications that Mother had cognitive deficits.   Dr. Lilley also asked Mother about her medical history.

{¶ 29} Dr. Lilley testified that Mother's responses to the MMPI were "very defensive, there's a lot of denial.   And in particular, denial of any personal thoughts and problems, denial of a lot of emotional factors."   (Tr. at 38.)   Dr. Lilley stated that the findings from the test indicated that Mother had "poor emotional controls, likely being emotionally reactive, can be very explosive. * * * [S]he tends to be the type of person who's gonna be very resistant and reactive to suggestions, recommendations, criticism from others.   She's likely to engage in behaviors that may not be consistent with societal norms, so, um, she's likely to engage in behaviors that may bring her the attention of either legal authorities or * * * may create parent or relationship concerns."   (Tr. at 39-40.)

{¶ 30} Dr. Lilley explained that individuals who are emotionally explosive and have poor emotional controls may have "significant problems in parenting, because the

individual may be more likely to react to situations that would not warrant that excessive behavior. So, the person is likely to be more reactive toward frustration control, and often times may behave in somewhat of an egocentric manner, where they put their needs prior to the needs of others," including a child. (Tr. at 40-41.)

{¶ 31} With respect to the Parenting Stress Index, a test designed for looking at various stressors that impact parenting, Dr. Lilley testified that she found that the stressors were only attributed to the child, meaning that Mother did not see her own behavior as a potential source of stress for the parent-child relationship. Dr. Lilley stated that Mother did not acknowledge herself as having any problems or behaviors that would create problems in parenting and denied any daily-living stressors.

{¶ 32} Dr. Lilley stated that Mother's answers were inconsistent with statements made by Mother during her clinical interview. For example, Mother told Dr. Lilley that she had no mental health symptoms since age 18, had not needed therapy, and had not required medication. However, when Mother did her intake assessment with South Community, she reported that she needed help with depression, anxiety, and attention deficit hyperactivity disorder, and that she needed medication for those issues. Dr. Lilley further noted that Mother had a history of residential evictions, explosive behaviors in her parents' home, and a disorderly conduct charge, but Mother denied that she had any symptomology. Dr. Lilley explained that this was significant, because when all causes for her difficulties are perceived as external, there is little motivation to change behavior and the prognosis for change is marginal.

{¶ 33} Mother told Dr. Lilley that doctors were concerned about her drinking when she was in her 20s, but Mother was not drinking at the time of her evaluation with Dr.

Lilley. Mother admitted to drinking one glass of wine about four times per week during her pregnancy with C.R.; Mother told Dr. Lilley that her doctor did not approve of her drinking, but a nurse had said it was okay. Dr. Lilley testified that there were discrepancies in what Mother told Dr. Lilley about attending Alcoholics Anonymous (AA) meetings and what she told her caseworker.

{¶ 34} Dr. Lilley asked Mother about the allegation that she dropped C.R. in the hospital nursey after he was born and failed to check on him; Mother denied those allegations.

{¶ 35} With respect to the Rotter Incomplete Sentences Blank, Dr. Lilley stated that Mother talked about how much she wanted to spend time with C.R. Dr. Lilley testified that Mother "presented the image of someone who wanted me to feel that she was a very devoted, involved, engaged, and interested parent." (Tr. at 48.) Dr. Lilley noted, however, that Mother's statements were inconsistent with her history of visitation.

{¶ 36} Dr. Lilley observed Mother interact with C.R. in October 2018, when C.R. was seven months old. At that time, Mother "did a very good job of picking up toys that were appropriate to [C.R.'s] developmental level. She engaged in play activities with him at appropriate level." (Tr. at 55.) Dr. Lilley did not observe any negative reaction to suggest that C.R. was anxious or frightened or distressed at being with Mother. At one point, C.R. became fussy and Mother "did things that were very appropriate trying to soothe [C.R.] during that time." (Tr. at 56.) Dr. Lilley observed that Mother was a bit frustrated with his behavior, which was not unexpected. Mother eventually asked Maternal Grandmother to take C.R. because she (Mother) was not able to soothe him. Dr. Lilley stated that, at the time of that interaction, "there were steps being made to

develop a bond between" Mother and C.R. (Tr. at 58.)

{¶ 37} Dr. Lilley diagnosed Mother with a personality disorder with borderline and narcissistic features. Dr. Lilley stated that individuals with this diagnosis may have difficulty with emotional controls, be emotionally needy, have instability in relationships/jobs, be unresponsive to rules and authority figures, be very rigid and behave impulsively, and be egocentric, putting their needs before others. With respect to parenting, Dr. Lilley said these individuals may be overly punitive or overly lax with children. Dr. Lilley stated that they have difficulty with looking at their behavior and past issues and using that to modify future behavior, which can create a very unstable environment for a child.

{¶ 38} Dr. Lilley also diagnosed Mother with an adjustment disorder mixed with disturbance of emotions and conduct. Dr. Lilley stated that this often was a short-term diagnosis given to someone who is undergoing a lot of stress.

{¶ 39} Dr. Lilley recommended that Mother engage in mental health therapy, emphasizing that the therapist should have a copy of the psychological evaluation. Dr. Lilley stated that she would want to see a period of relationship, residential, and personal stability for a period of 12 months before C.R. were placed in Mother's care. Dr. Lilley testified that, without such therapy, she would be concerned that C.R. would be at risk of harm in Mother's care. Dr. Lilley testified that, "at this time, * * * [Mother] had not demonstrated sufficient * * * personal stability in order for reunification to be recommended." (Tr. at 64.)

{¶ 40} Heather Prince, MCCS caseworker, testified that MCCS received a referral about Mother after C.R.'s birth. MCCS created a case plan for Mother, which included

undergoing an alcohol and other drug assessment, a parenting and psychological evaluation, and a mental health assessment; obtaining and maintaining income and stable housing; and signing releases.

{¶ 41} Prince testified that Mother had multiple residences during the course of the case and was "couch surfing" at times. Mother was living in Dayton when the hearing occurred, and she had had four residences since Maternal Grandparents received temporary custody of C.R. Mother and her husband, whom she married on October 25, 2019, moved into her current residence around September 2019; Prince understood that the landlord was going to allow them to stay there rent-free initially if they worked on remodeling the property.

{¶ 42} Mother reported working at Wendy's and provided check stubs for that employment. Mother was hired by Wendy's in November 2019.

{¶ 43} Prince indicated that she made a referral for a parenting class, and Mother completed that class. Prince stated that her supervisor looked up Mother's husband in "CJIS" (presumably, Criminal Justice Information Service), and the supervisor was unable to find anything on Mother's husband.

{¶ 44} Prince testified that she made referrals for a drug and alcohol assessment and a mental health assessment. Prince stated that she had concerns about Mother's mental health due to reports of Mother's erratic and explosive behavior. Mother reportedly punched her brother when he was nine. More recently, Maternal Grandparents had had to call the Sheriff's Office to have Mother removed from their home. Father reported that, when he and Mother were together, he had to keep Mother away from his older son due to Mother's behaviors. Prince stated that she had also seen

Mother escalate a couple times, including during a visit in July 2019. Providers from Help Me Grow also had indicated that they have needed to deescalate situations during visits when Maternal Grandmother had offered simple instructions and Mother had not liked it.

{¶ 45} Prince agreed that Mother completed the parenting and psychological evaluation with Dr. Lilley. Prince stated that she spoke with Mother about the recommendations from the evaluation, and Mother reported that she was connected with South Community. Prince stated that she had not been able to get a report from South Community. Prince acknowledged that Mother attended Keep Moving Forward for a while. Prince also spoke with Mother's initial therapist, who indicated that he was uncomfortable talking with Mother because of some of the things she told him and that he had referred her to another therapist. Prince talked to the second therapist, who worked with Mother for a while. Around early 2019, the second therapist told Prince that she was no longer going to treat Mother, but recommended that Mother continue with therapy. Mother then went to another individual who described herself to Prince as a life coach. After an incident with her now-husband in September 2019, which prompted Mother to check herself into the hospital for a few days, Mother indicated that she was going to return to therapy with South Community. Prince stated that she was unable to verify Mother's return to therapy with South Community.

{¶ 46} Prince testified that Mother completed her alcohol and drug assessment in April 2018. It was recommended that Mother attend AA meetings. Mother provided documentation of her AA attendance, but Prince testified that she, her supervisor, and the case reviewer believed the documentation was fake.

{¶ 47} On cross-examination by the GAL, Prince testified that, since August 2019, Mother twice had gone to the hospital due to her mental health. During one hospitalization, Mother was prescribed Naltrexone for alcohol abuse. In September 2019, Mother was arrested due to a domestic violence incident with her now-husband, but she was taken to the hospital. Prince believed that Mother was charged with domestic violence.

{¶ 48} Prince stated that Mother initially was not cooperative in providing releases of information. However, "throughout the later part of the case," she was.

{¶ 49} When asked to explain the basis for MCCS's request that legal custody of C.R. be given to Maternal Grandparents, Prince stated that there had been "a lot of inconsistencies with [Mother's] mental health," including whether Mother was on medication. Prince stated that, "[w]ith the outbursts * * * and the recent threat to [Maternal Grandparents'] home with [C.R.] in the home," Mother's mental health had not been managed long enough and been consistent enough for MCCS to feel comfortable placing C.R. in Mother's care. On cross-examination, Prince stated that she also wanted to see more consistency with Mother's income and housing.

{¶ 50} Prince testified that Father had visited consistently with C.R. since paternity was established in July 2018. Prince did not have any concerns as to Father. Prince indicated that Father was in agreement with MCCS's request for legal custody of C.R. to Maternal Grandparents.

{¶ 51} Mother testified on her own behalf. Mother testified that she moved into her current residence on August 27, 2019, and that she and her husband were renovating the house. Mother described the home as a two-story house with two upstairs

bedrooms, a large kitchen, two bathrooms, three closets, and a basement. The home had a front yard and backyard. C.R. had his own bedroom. Mother stated that she had not signed any paperwork with the landlord, but they had a rent-to-own agreement because of the renovations.

{¶ 52} Mother confirmed that she had married her husband in October 2019, and had been working at Wendy's since mid-November 2019. Mother stated that her husband received Social Security Disability and volunteered during the day. Both Mother and her husband received food stamps. Mother testified that their income was sufficient to support a family of three. Mother stated that they had plenty of food and their utility payments were up-to-date.

{¶ 53} Mother testified that she had been compliant with MCCS's requests for drug testing.

{¶ 54} Mother stated that she had just started intensive therapy, which was helping her. Mother also stated that she had started on medication called Citalopram in October 2019. Mother reported that her doctor said that it could take six months for the medication to show its full effects. Mother stated that she had signed up for anger management classes, which would begin the following week.

{¶ 55} Mother testified that her domestic violence case had been dismissed, and she and her husband had not had any problems since that incident.

{¶ 56} When asked to describe her visits with C.R., Mother indicated that her relationship with Maternal Grandmother was strained and had been since she was a child, so she tried to focus on C.R. and his needs. Mother stated that she plays with C.R.; he particularly likes when she carries him like an airplane or holds him upside-down. Mother

explained her reasons for missing visits, stating that she had some health issues, including severe depression, influenza, and diarrhea.

{¶ 57} Mother stated that she felt bonded with C.R. and would like to have more time with him. Mother reiterated that her relationship with her mother was "absolutely horrible," and she felt like her mother was "taking my parenting privileges away and being a little controlling." (Tr. at 100-101.)

{¶ 58} With respect to AA meetings, Mother testified that she had stopped going to AA meetings for a month and, after speaking with her therapist, she resumed going to AA meetings the day before the hearing. Mother stated that her husband had been helping her to stay sober.

{¶ 59} Mother testified that she believed that she had substantially completed her case plan objectives and that she would be continuing with them. Mother indicated that she would be willing to engage in any additional services requested by MCCS. She was willing to do "whatever it takes" to get C.R. back. Mother stated that she had signed all the releases of information that MCCS requested. Asked why it was in C.R.'s best interest to be returned to her, Mother responded:

> Because I love my son, and I'm the biological mother. And you know what,
> I have a strong support system. I'm sober, I'm clean, I have – I'm going to
> therapy. I'm getting the help I need and I'm making a huge effort, and that's
> not gonna stop. And you know what, um, I'm never gonna stop fighting for
> him no matter what because I love him. I love him.

(Tr. at 102.)

{¶ 60} On cross-examination by MCCS, Mother testified that she had lived in three

residences since her involvement with the agency. Mother explained that she moved because she had job losses. Mother stated that she had had "about eight" jobs since her involvement with MCCS began. On cross-examination by Father's attorney, Mother stated that she worked 20 to 30 hours per week, with shifts of five to eight hours. Mother indicated, however, that Wendy's had cut her hours due to a discrimination case that she had brought against it. Mother stated that her monthly income was $300 to $400, but she had applied for Social Security Disability benefits.

{¶ 61} The GAL did not testify, but the trial court asked for the GAL's recommendation based upon the testimony provided at the hearing. The GAL stated that her recommendation, based upon her investigation and the testimony, continued to be that legal custody be granted to Maternal Grandparents. The GAL also recommended that Mother's visitation remain supervised and limited to two hours per week.

{¶ 62} Based on the evidence presented at the January 2020 hearing and the GAL's recommendation, the trial court found that legal custody to Maternal Grandparents was in C.R.'s best interest. In reaching that conclusion, the trial court initially rejected Mother's suggestion that she should have additional time to work on her case plan objectives. The court noted that Mother had from March 2018 to January 2020 to address the existing concerns, yet at the time of the hearing, she had only recently begun intensive therapy, had been on medication for three months, and had not yet started anger management classes. In addition, Mother had had her then-current housing and employment for less than six months.

{¶ 63} The trial court further noted Dr. Lilley's diagnoses for Mother and that

Mother had been removed from her parents' home on multiple occasions due to her behavior. Mother had been arrested in September 2019 for domestic violence and had been hospitalized on two separate occasions for mental health reasons.

{¶ 64} The trial court recognized that C.R. had "a level of comfort and familiarity with Mother." However, the trial court further found that C.R. had been in Maternal Grandparents' care since birth, had been well cared for, and had an existing bond with them. The court noted that Mother, in contrast, had never independently parented C.R. or even had unsupervised visitation.

{¶ 65} Upon review of the record, the evidence demonstrated that C.R. had a strong bond with Maternal Grandparents, the other family members in the home, and his sitter, whom he saw when Maternal Grandmother was working. Maternal Grandparents and Father had a good relationship, and Father saw C.R. regularly; Maternal Grandparents and Father anticipated that Father would have increased independent interaction with C.R. as time went on. Both Father and the GAL agreed that legal custody should be granted to Maternal Grandparents.

{¶ 66} Mother did not demonstrate that she had stable employment or housing. The record reflects that Mother had not shown a consistent effort to address her alcohol abuse or mental health issues. Dr. Lilley described Mother as having an explosive personality, being resistant to authority figures and recommendations, and having poor emotional controls. Mother's domestic violence incident, her interactions with her parents, and her hospitalizations for mental health issues reflected that Mother continued to struggle with her mental health, which likely would negatively affect her parenting of C.R. Mother's visitation had been supervised, and it was recommended that it continue

to be.

**{¶ 67}** We find no abuse of discretion in the trial court's finding that legal custody to Maternal Grandparents was in C.R.'s best interest and in its grant of legal custody to Maternal Grandparents.    The record also supported the trial court's findings that granting Mother's motion for reunification or providing her additional time to work on her case plan was not in C.R.'s best interest.    Accordingly, Mother's assignment of error is overruled.

### IV. Conclusion

**{¶ 68}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Robert Alan Brenner
Adam Krumholz
Serah Siemann
S.R. & W.R.
Hon. Helen Wallace