**[Cite as *In re M.H.*, 2023-Ohio-3776.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: M.H. AND J.H.C.  :  APPEAL NO. C-220437
TRIAL NO. F20-431X

:  *O P I N I O N.*

Appeal From: Hamilton County Court Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 18, 2023

*Barr, Jones & Associates, LLP,* and *Christopher Sawyer*, for Appellee Grandmother,

*H. Leon Hewitt,* for Appellant Mother.

**BOCK, Judge.**

{¶1}   Mother appeals the juvenile court's award of custody of her two daughters, J.H.C. and M.H., to their maternal grandmother ("Grandmother"). She challenges the court's abandonment and best-interest findings. She also argues that J.H.C.'s guardian ad litem ("GAL") was biased. Because the record supports the juvenile court's judgment, we affirm.

## I. Facts and Procedure

{¶2}   When J.H.C. was born in 2009, Mother and J.H.C.'s father, C.C., were incarcerated. Therefore, J.H.C. lived with Grandmother in Cincinnati. In 2011, Mother, now released from prison, gave birth to M.H. While J.H.C. continued residing with Grandmother, M.H. resided with Mother and M.H.'s two older brothers, J.C. and C.H., not far from J.H.C. and Grandmother.[1]

{¶3}   But in April 2020, Mother relocated to Texas with her four children. That month, Grandmother filed for legal custody of J.H.C. The trial court appointed a GAL to represent J.H.C.'s interests. The parties filed several pretrial motions. Grandmother requested visitation rights with J.H.C. Additionally, the GAL requested an in-camera interview with J.H.C., a psychological evaluation of Mother, and a drug test for Mother.

{¶4}   In June 2020, the magistrate held the GAL's requests in abeyance, finding that the Hamilton County Department of Job and Family Services ("HCJFS") "does not have concerns with mother" and noting "Mother does not appear to have a history with HCJFS." Relevant here, Mother was "living in Houston, Texas with the

---

[1] We take this opportunity to remind all parties that a juvenile's name in any appeal is "personal and private" and shall not be included in any unsealed document filed with this court under 1st Dist. Loc.R. 13.2(e).

child" but would only "provide a P.O. Box for the court" because she "feels that she is being harassed by her mother/maternal grandmother and the GAL."

*Magistrate Orders Mother to Return J.H.C. to Ohio.*

{¶5}    By August 2020, the magistrate convened another hearing and found that J.H.C. had spent her entire life under the care of Grandmother, and that:

> Mother took the child, her sibling and another child [J.C.] whom mother does not have legal custody of, and left Ohio. Mother will not permit the child to have contact with anyone, including Maternal Grandmother, without Mother's permission. Mother is refusing to cooperate with the GAL. Mother states she is currently living in Texas. She refused today to provide the court with her current address or any information on where the child is enrolled for school.

{¶6}    The magistrate expressed concern that Mother had "no housing or income and that she is mentally ill and unable to parent the child." Consequently, the magistrate ordered J.H.C.'s older brother to be returned to his maternal aunt's care (his legal custodian). And the magistrate directed Mother to return J.H.C. to Ohio no later than August 21, 2020, to facilitate visitation between J.H.C. and Grandmother.

*Magistrate Awarded Grandmother Emergency Custody of J.H.C.*

{¶7}    In late August 2020, the magistrate held an emergency custody hearing and determined that J.H.C. faced "imminent risk of harm in Mother's care." As a result, the magistrate awarded Grandmother emergency custody of J.H.C. In addition to the imminent danger posed to J.H.C., the magistrate noted Mother did not have custody rights to two of her biological children, had "refused to provide the court with an address in Texas," and consistently refused to engage with the GAL. Furthermore,

3

Mother has failed to comply with this courts [sic] order to return the child to Ohio for an extended visit with grandmother and to let the court speak with the child in camera. Mother told the court at the last hearing that she had no money to return to Ohio with this child, yet the court's check in screen shows that Mother appeared in person in this court yesterday, 8/27/2020 for another child's hearing.

Consequently, the magistrate ordered that J.H.C.'s "name be placed on the National Crime Information Center Missing Persons database," and ordered that Mother personally appear at the next hearing.

{¶8} That same day, Grandmother filed for custody of M.H.

{¶9} Shortly thereafter, in early September 2020, the magistrate held another hearing. Citing testimony from the GAL and Grandmother, the magistrate noted, "Mother was in Cincinnati [during the August 28th hearing]. She left Cincinnati with the child and gave the child to a relative in Kentucky. The police were able to obtain [J.H.C.] from the relative in Kentucky and [she] is currently with [Grandmother]." Mother assured the magistrate that J.H.C. was safe in her care. The magistrate found Mother's testimony and assurance lacked credibility, citing "evidence presented at the prior hearings, today's hearings, and the exhibits admitted into evidence." And the magistrate noted Mother's "refus[al] to provide her address in Texas on the record."

### *Magistrate Awarded Grandmother Interim Custody of M.H.*

{¶10} After a hearing later that month, the magistrate concluded that M.H. "is at risk of harm in Mother's care" and placed M.H. in Grandmother's interim custody, ordering Mother "to return [M.H.] to [Grandmother's] physical custody." That finding and order was influenced, in part, by the magistrate's in-camera interview with J.H.C.,

4

who revealed that she was subjected to emotional abuse, threats of harm, and more in Mother's care. And the magistrate cited Mother's "belligerent and abusive conduct in the waiting area today, this court hearing, and past court hearings." Further, the magistrate gave no weight to the HCJFS caseworker's April 2020 interview with J.H.C. and her siblings, which occurred in the home with Mother present.

### *Mother is Charged with Interfering with Custody.*

{¶11}   Following a November 2020 hearing, the magistrate ordered Mother to "obtain a psychological evaluation at her cost" because of Mother's "erratic behavior in this matter." Further, the magistrate noted that Mother was "charged with two counts of interfering with custody related to her failure to comply with this court's prior orders." The magistrate permitted J.H.C. "to have phone contact with Mother," at J.H.C.'s discretion and under Grandmother's supervision. The magistrate found it "unclear where [M.H.] is residing right now. Mother's attorney states she is in Cincinnati. However, Mother stated in another hearing today, that [M.H.] was still with her in Texas."

{¶12} In February 2021, M.H. returned to Cincinnati to live with Grandmother.  Two months later, the magistrate granted Mother supervised visitation with M.H. in Cincinnati. There was some testimony that Grandmother interfered with both Mother's and J.H.C.'s father's ability to contact J.H.C. The magistrate ordered that J.H.C. had discretion over whether to accept her father's phone calls. Similarly, M.H. was granted discretion over her contact with Mother.

### *Suitability Hearing.*

{¶13}   In August 2021, the magistrate held a suitability hearing and heard testimony from the GAL, Grandmother, and the children's maternal aunt, K.H. Grandmother submitted several exhibits into evidence, including the GAL's initial and

5

supplemental reports and police reports. Mother's evidence consisted of a school letter regarding M.H. and M.H.'s "IEP" documents.

{¶14} The GAL recommended placing J.H.C. in Grandmother's custody. According to the GAL, Mother exhibited a pattern of uncooperative behavior, intentionally misled the GAL, obstructed the GAL's attempts to communicate with J.H.C., and withheld her address and employment details. The GAL described Mother's interference with J.H.C.'s remote learning during COVID. And despite having been granted visitation with M.H., she did not visit her daughters. Instead, the GAL testified that Mother had "one conversation" with M.H.

{¶15} On cross-examination, the GAL acknowledged that the GAL report was not updated after September 2020. And while the report highlighted Mother's possible mental-health issues, there was no medical documentation to substantiate that concern. Furthermore, the GAL acknowledged an incident with J.H.C., who was in the company of an undisclosed individual while Mother was out of town. During this time, J.H.C. was prohibited from speaking with Grandmother. When J.H.C. was finally able to reach Grandmother, "she didn't want to be where she was," prompting Grandmother's advice to misbehave and prompt a call to 241-KIDS.

{¶16} K.H., the children's maternal aunt, testified that Mother had "ADD" as a child and "has some like bipolar, mental issues and stuff like that." She and Mother do not speak, do not get along, and K.H. was granted a protective order ("CPO") against Mother in 2019. While K.H. has no concerns about Mother's parenting, she did express concern over Mother's behavior in "that bipolar mode." Before moving to Texas, Mother had a "spontaneous" change of personality–"all of a sudden she just did a 360 and started being rude, disrespectful, and obnoxious with [Grandmother]."

6

**{¶17}** Grandmother's testimony addressed Mother's mental health and their tumultuous relationship. She recalled an incident where Mother came to her door "banging, kicking the door, cussing and hollering outside, pulling [her] pants down." The police responded and told Grandmother that she had two options, "You either go file for custody for her or you let her take [J.H.C.]." According to Grandmother, this prompted her filing for custody of J.H.C. And yet, she later explained that J.H.C.'s aversion to relocating to Texas had motivated her to file for custody.

**{¶18}** Of particular significance, Grandmother's testimony shed light on Mother's behavior following the magistrate's April 2021 order granting Mother visitation with her daughters. Grandmother revealed that Mother had failed to exercise her right to visit her daughters. Furthermore, Grandmother explained that Mother had no contact with J.H.C. following her return to Ohio and Mother provided Grandmother with no support for J.H.C. A similar pattern emerged when M.H. returned to Ohio. And once again, Mother offered no support to Grandmother for M.H.'s care.

### *Best-Interest Hearing.*

**{¶19}** At the November 2021 best-interest hearing, the magistrate heard testimony from C.C., Grandmother, Grandmother's fiancé ("step-Grandfather"), the GAL, a HFJCS caseworker, and Mother. The parties jointly submitted an HCJFS activity log. Mother also submitted several documents as exhibits, including records of her business in Texas, M.H.'s "IEP," documentation of her business in Ohio, a letter from the University of Texas Health Center, a Texas Department of Family and Protective Services letter concerning allegations of abuse or neglect, an Ohio Department of Job and Family Services 2020 intake report, and court documents relating to Mother's 2021 petition for bankruptcy.

7

{¶20} Step-Grandfather testified in support of Grandmother's custody petitions. He began by describing the children's lives with Mother. He alleged that Mother earned money through shoplifting and returning stolen merchandise, often involving her children in the process. He testified that J.H.C. had threatened self-harm while in Mother's care. In contrast, he described J.H.C.'s and M.H.'s academic success following their return to Ohio. He also described Mother's lack of visitation with J.H.C. or M.H. upon their return from Texas, as well as her sporadic communication with M.H. While Mother initially kept in touch with M.H., she "stopped talking to her, stopped calling her." Their last conversation had occurred in October, when M.H.'s brother called M.H. to wish her a happy birthday.

{¶21} Grandmother provided insight into J.H.C.'s and M.H.'s lives under her care. J.H.C. excelled academically and was actively engaged in sports. M.H. too was making strides in school, received counseling and speech therapy, and expressed an interest in extracurricular activities. Grandmother denied blocking Mother's phone number to prevent the girls from speaking with Mother.

{¶22} The GAL supported granting custody of J.H.C. to Grandmother. The GAL's testimony described J.H.C.'s progress and her desire to remain with Grandmother. The GAL also emphasized J.H.C.'s willingness to communicate with Mother.

{¶23} The GAL also described some information in the HCJFS records regarding Mother, specifically "three intakes" in 2015 regarding allegations of sexual abuse concerning M.H., which HCJFS ultimately deemed unsubstantiated. Additionally, the records indicated that J.H.C. had exhibited self-harm tendencies in both 2018 and 2020. The joint exhibit further contained four reports of unsubstantiated allegations of abuse involving J.H.C. The GAL acknowledged that the

8

HCJFS activity log mentioned that Mother provided text messages on J.H.C.'s cell phone from Grandmother. Those text messages instructed J.H.C. to "act crazy, to run away, to run down the street so that someone would contact the police, to say disrespectful things, and to tell [Mother] that she doesn't want to live in her home." The GAL explained that she spoke with Mother about those messages and took that information into account when forming a recommendation. The GAL emphasized the context of the text messages, as Mother had "left town" and J.H.C. "was staying at somebody's house she didn't know and was [un]comfortable with."

{¶24} The HCJFS caseworker described her observations of Mother and the children during an April 2020 visit to Mother's home. She had no concerns about Mother, describing her as "appropriate." The caseworker recalled interviewing the children while Mother was in the home, during which the children neither disclosed any signs of maltreatment nor articulated any negative statements about Mother. The caseworker described Mother and Grandmother's tenuous relationship, explaining that J.H.C. informed the caseworker that Grandmother instructed her to "act up."

{¶25} C.C., J.H.C.'s father, testified in support of Mother. He described his relationship with J.H.C. and his sustained contact with her despite having been incarcerated for J.H.C.'s entire life. He testified that Grandmother had cut off his communication with J.H.C. in February 2021. Before that, C.C. testified, J.H.C. never indicated that something was wrong with her life in Texas. But after she returned to Ohio, C.C. began to suspect that "somebody was feeding her information." Specifically, he stated that step-Grandfather was "running the show."

{¶26} Mother's testimony touched on her relationship with Grandmother, her relationship with her daughters, the Texas move, her life there, her relationship with the GAL, and her mental health.

9

{¶27} Mother mentioned that, around 2009, Grandmother was not approved for custody of J.H.C. because of her criminal record. Mother described her close connection to M.H. and acknowledged the strong bond between J.H.C. and Grandmother. But Mother insisted that she had always been involved in both of her daughter's lives. According to Mother, things changed when J.H.C. reported to her that Grandmother "told me if you ever try to come to the school and take me just go running down the highway and say that you['re] crazy and [that] you['re] abused." Later, Grandmother reported Mother to 241-KIDS. Furthermore, Mother testified that Grandmother had offered her $500 each month for J.H.C. before Grandmother filed for custody.

{¶28} Mother explained that she moved to Texas for her business. There, she lives in a three-bedroom home and is self-employed. Mother conceded after moving to Texas in 2020, she delayed enrolling her children in school until November of that year because of "people trying to hunt me down by my address, because they want[] to try to take my kids from me for no []apparent reason." Mother also acknowledged her refusal to comply with the order to return the children to Cincinnati to visit with Grandmother, explaining that Grandmother "wanted to brainwash my children and tell them how to lie on their mother." In particular, she conceded that, while she returned to Ohio with J.H.C. for an unrelated court hearing, she failed to inform Grandmother. She acknowledged her noncooperation with the GAL. She admitted to taking her two sons, over whom she did not have custody, to live in Texas "because they're my children."

{¶29} Mother testified that, after J.H.C.'s and M.H.'s return to Ohio, Grandmother prevented Mother from contacting M.H. without Grandmother's supervision. Mother conceded that she suggested that Grandmother keep J.H.C. to

10

avoid involving M.H. in the custody battle. She acknowledged never exercising her visitation rights but explained that she "want[s] to be able to see my kids and take my kids and do stuff with my children" and disagreed with the need for supervised visitation. She also cited financial constraints as an obstacle to exercising her visitation rights. She believed that Grandmother influenced J.H.C. to mislead the court in her in-camera interview. And Mother disagreed with Grandmother's decisions regarding M.H.'s mental health.

{¶30} Mother denied a bipolar diagnosis, acknowledged her sister's CPO, and admitted to a March 2020 incident involving the police at Grandmother's house due to her behavior. She expressed her intention to pursue a TPO preventing Grandmother from contacting her or her children if granted custody of J.H.C. and M.H.

{¶31} In addition, the magistrate held in-camera interviews with 12-year-old J.H.C. and 10-year-old M.H. Both girls informed the magistrate that they preferred to stay together and live with Grandmother.

*Trial Court Awarded Maternal Grandmother Custody of M.H. and J.H.C.*

{¶32} The magistrate issued an order with extensive factual findings and a comprehensive analysis of the law. First, the magistrate addressed the suitability of the parents. Both M.H.'s and J.H.C.'s fathers are incarcerated and thus unable to fulfill their parental responsibilities. Additionally, the magistrate concluded that Mother was unsuitable because she had abandoned M.H. and J.H.C. Furthermore, the magistrate evaluated the relevant best-interest factors and concluded that awarding legal custody to Grandmother was in the best interest of the children.

{¶33} Over Mother's objection, and following a hearing, the juvenile court adopted the magistrate's decision and granted Grandmother custody of J.H.C. and M.H. The juvenile court explained that the magistrate "properly determined the

factual issues and appropriately applied the law."

## II. <u>Law and Analysis</u>

{¶34} On appeal, Mother challenges the juvenile court's award of custody to Grandmother in three assignments of error. First, she disputes the findings of abandonment and unsuitability. Second, she contests the juvenile court's best-interest determination. Third, she raises issues of the GAL's bias.

### A. *The Record on Appeal Includes the Necessary Transcripts.*

{¶35} As a threshold matter, Grandmother argues that Mother failed to file the necessary transcripts in violation of App.R. 9. Mother filed the transcripts of both the unsuitability and best-interest hearings. Grandmother argues that Mother failed to provide a transcript of the juvenile court's August 2022 hearing addressing Mother's objections to the magistrate's decision.

{¶36} Under App.R. 9(B)(1), an appellant must "ensure that the proceedings the appellant considers necessary" are transcribed. And App.R. 10(A) requires the record on appeal to consist of "the transcript and exhibits necessary for the determination." While Grandmother argues that an allegedly incomplete record will stifle this court's ability to resolve the factually dependent legal questions, the juvenile court explained that the August 2022 hearing consisted of "the parties reiterat[ing] and expand[ing] upon the arguments contained in their written filings." Moreover, all pertinent factual determinations derive from the evidence presented during the magistrate's hearings. Therefore, the record on appeal contains the transcripts and exhibits necessary to reach the merits of Mother's arguments.

### B. *Parental Rights and Legal Custody.*

**{¶37}** We begin by recognizing that the juvenile court's judgment is not a complete termination of Mother's parental rights, an outcome described as "the family law equivalent of the death penalty." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Indeed, the juvenile court's decision did not divest Mother of her residual parental rights, including her right to visit her children. *See State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Court of Common Pleas*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 31, quoting R.C. 2151.011(B)(49). But we also recognize that the award of legal custody abrogates Mother's "fundamental liberty interest in the care, custody, and management" of her daughters. *See Hockstok v. Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). Given these stakes, child-custody issues are some of the most demanding and heart-wrenching matters with which a trial court must grapple. *See Kane v. Hardin*, 1st Dist. Hamilton No. C-180525, 2019-Ohio-4362, ¶ 6, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Therefore, we afford the juvenile court "wide latitude in considering all of the evidence" and discretion in determining custody cases. *Id.*, quoting *Davis* at 418.

**{¶38}** We review the juvenile court's decision to grant legal custody under an abuse-of-discretion standard. *In re R.V.*, 1st Dist. Hamilton No. C-200170, 2021-Ohio-1830, ¶ 10, citing *In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116, ¶ 3. To reverse the juvenile court's grant of custody to Grandmother, we must find its decision unreasonable, arbitrary, or unconscionable. *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶39}** While the court "has discretion in custody proceedings, 'the record must contain sufficient factual evidence to support the court's findings.' " *In re C.V.M.,* 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 6. We therefore review the juvenile court's findings to determine whether there is competent and credible evidence in the record supporting those findings. *See In re R.V.* at ¶ 17 ("A trial court's decision that is not supported by competent, credible evidence is unreasonable"). Specifically, a juvenile court must make two findings when awarding legal custody of a child to a nonparent over the request of the child's natural parent. First, the court must make "a finding of parental unsuitability." *Id.* at ¶ 18. Second, the award of legal custody must be in the best interest of the children. *Id.*

C. *The Evidence Supports the Finding of Abandonment.*

**{¶40}** It is well established that " 'suitable' p[arents] have a 'paramount' right to the custody of their minor children." *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977), quoting *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877). Therefore, the law limits the circumstances in which a court may grant custody of a child to a nonparent. *Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, at ¶ 17. But a parent's rights are not absolute. *Reynolds v. Goll*, 75 Ohio St.3d 121, 123, 661 N.E.2d 1008 (1996). Rather, parental rights are considered in conjunction with the welfare of the child. *Id.*, quoting *Bayer* at 310. When a court grants custody of a child to a nonparent, there must be a threshold determination that the parent is unsuitable. *See In re Perales* at 98-99; *see also In re R.V.* at ¶ 18. The nonparent bears the burden of establishing unsuitability. *In re H.J.H.* at ¶ 10.

**{¶41}** A nonparent may establish unsuitability by demonstrating that "(1) the parent has abandoned the child, (2) the parent contractually relinquished custody of the child, (3) the parent has become incapable of supporting or caring for the child, or

14

(4) an award of custody would be detrimental to the child." *In re R.V.,* 1st Dist. Hamilton No. C-200170, 2021-Ohio-1830, at ¶ 19, citing *Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, at ¶ 17, and *In re Perales* at syllabus.

**{¶42}** Here, the juvenile court found that Mother had abandoned both J.H.C. and M.H. Abandonment is " 'any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child.' " *In re C.R.,* 2022-Ohio-3540, 197 N.E.3d 68, ¶ 20 (1st Dist.), quoting *In re Custody of C.E.,* 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 12, citing *Baker v. Rose,* 28 Ohio Misc. 200, 203, 270 N.E.2d 678 (C.P.1970), and *In re Masters,* 165 Ohio St. 503, 505-506, 137 N.E.2d 752 (1956). But because it is often difficult to prove intent, " 'a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.' " *Id.* at ¶ 20, quoting R.C. 2151.011(C).

**{¶43}** We begin with J.H.C. The juvenile court based its abandonment finding on the fact that J.H.C. had lived with Grandmother practically since birth. The court acknowledged Mother's role in taking J.H.C. to medical appointments, enrolling her in school, and relocating J.H.C. to Texas with her. But significantly, once J.H.C. returned to Cincinnati, Mother made no attempts to contact her and did not exercise her right to supervised visitation with her daughter.

**{¶44}** These findings are substantiated by the evidence in the record. Multiple witnesses confirmed that J.H.C. spent most of her life with Grandmother. The testimony, including Mother's, establishes that Mother did not speak to J.H.C. after her return to Cincinnati. And Mother told Grandmother that "she can have [J.H.C.]" to keep M.H. out of any custody battle.

{¶45} Turning to M.H., the court found that Mother initially acted as a parent, but after M.H.'s return to Ohio in February 2021, Mother had no contact with M.H. for a period of six months. The evidence supports this finding. Step-Grandfather testified that Mother "started off talking to [M.H.]," but "for some reason or another, she just stopped talking to her, stopped calling her." And Mother acknowledged that she had no contact with M.H.

{¶46} Mother challenges those abandonment findings. She relies on her continued opposition to the juvenile court's order of supervised visitation and the financial burden associated with multiple flights each week between Texas and Ohio. While we recognize the significant financial burden of such frequent travel, it does not justify her lack of communication with her daughters. While Mother asserts that Grandmother blocked "her phone calls to her daughters," the magistrate heard conflicting testimony regarding that issue. And " ' "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." ' " *Huff v. Carson*, 3d Dist. Hancock No. 5-07-05, 2007-Ohio-5194, ¶ 30, quoting *State v. Shafer*, 3d Dist. Hardin No. 6-05-15, 2006-Ohio-4189, ¶ 28, quoting *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986). In these scenarios, we defer to the trier of fact, who was "in the best position to view the witnesses and observe the demeanor, gestures and voice inflections so as to weigh the credibility of the presented testimony." *In re J.T.S.,* 12th Dist. Preble No. CA2014-09-009, 2015-Ohio-364, ¶ 21.

{¶47} Given the existence of competent and credible evidence supporting the abandonment finding, we find no abuse of discretion by the juvenile court. Therefore, we overrule Mother's first assignment of error.

*D. The Custody Award was in the Best Interest of the Children*

**{¶48}** In her second assignment of error, Mother argues that awarding Grandmother custody of J.H.C. and M.H. was not in their best interest.

**{¶49}** In child-custody cases, the underlying principle guiding the juvenile court's decision is the best interest of the child. At its core, a best-interest analysis "looks at the 'best' situation available and places the child there." *In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116, at ¶ 14. The juvenile court must determine the best situation available to the child and place the child in that situation. *In re C.V.M.,* 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, at ¶ 10, This "is a fluid concept, as it involves the child's continually-changing need for appropriate care." *In re D.M.,* 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 47, quoting *In re G.L.S.,* 9th Dist. Summit No. 28874, 2018-Ohio-1606, ¶ 16. And when a juvenile court resolves a custody dispute between a parent and nonparent, the nonexhaustive statutory factors in R.C. 3109.04(F)(1) govern its best-interest analysis. *In re C.R.,* 2d Dist. Montgomery No. 28842, 2020-Ohio-5208, ¶ 12.

**{¶50}** Under R.C. 3109.04(F)(1), the juvenile court must consider, along with any other relevant factors:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers[,] * * * the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

17

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶51} While the juvenile court is guided by these statutory factors, no one factor is conclusive of a child's best interest and "the weight to be given to any factor lies within the trial court's discretion." *Davidson v. Hodge*, 1st Dist. Hamilton No. C-220241, 2023-Ohio-1638, ¶ 25.

{¶52} Here, the juvenile court adopted the magistrate's finding that awarding custody to Grandmother was in J.H.C.'s and M.H.'s best interest. In terms of specific findings, J.H.C. and M.H. explained to the magistrate that they preferred to live with Grandmother, "express[ed] strong opinions[,] and good reasons for their opinion[s]." *See* R.C. 3109.04(F)(1)(b). While the magistrate found that the girls are "bonded with

18

Grandmother" and "interact well with [her], step-Grandfather and maternal aunt," the magistrate recognized that the HCJFS caseworker "saw no issues with Mother's parenting of the girls in her limited investigation." *See* R.C. 3109.04(F)(1)(c). And the girls "are both doing well in school and they are acclimated well to their school, Grandmother's home and to the community." *See* R.C. 3109.04(F)(1)(d).

{¶53} The magistrate noted that "[t]here was information presented and seen that makes the court believe that Mother may have some mental health issues," but explained that mental health was not "the sole basis to deny Mother custody of her children." *See* R.C. 3109.04(F)(1)(e).

{¶54} Likewise, the magistrate expressed concern over "whether Mother would follow any orders of the court that give Grandmother time with the children" considering "Mother's past inability to cooperate with the GAL or to follow the court's orders concerning the return of the children." *See* R.C. 3109.04(F)(1)(f).

{¶55} These findings are supported by competent and credible evidence in the record. Both girls unambiguously told the magistrate that they wished to live with Grandmother. Additionally, both girls reflected positively on their life under Grandmother's care. Grandmother, step-Grandfather, and the GAL explained that the girls are doing well in school and are adapted to life in Cincinnati. Likewise, multiple witnesses testified that Mother had experienced some mental-health issues. Finally, the case history and Mother's own testimony support the magistrate's findings that Mother may not honor any court-ordered visitation with Grandmother.

{¶56} Mother argues that the evidence demonstrates that she wanted to parent the girls, that M.H. expressed to HCJFS a desire to live with Mother, that Mother was prevented from contacting her children, and that she denied any mental-health issues that would interfere with her parenting.

19

**{¶57}** To be sure, there is some evidence supporting these claims. But the magistrate heard conflicting testimony on many of these matters. And we defer to the magistrate, who "is better equipped to examine and weigh the evidence and determine the credibility of the witnesses when making custody determinations." *In re M.D.D.*, 12th Dist. Butler No. CA2009-06-170, 2010-Ohio-326, ¶ 36.

**{¶58}** Accordingly, the evidence in the record supports the juvenile court's judgment finding that awarding custody of the children to Grandmother was in their best interest. We overrule Mother's second assignment of error.

### E. *No Evidence of the GAL's Bias.*

**{¶59}** In her final assignment of error, Mother argues that the GAL's report and her testimony were both the product of bias. Mother contends that the GAL was given information that Grandmother was coaching J.H.C. Likewise, she asserts that the HCJFS caseworker who investigated the children testified that there were no issues with Mother's parenting. Therefore, she argues that the GAL's testimony and report should have received less weight.

**{¶60}** Mother is correct that a GAL "must discharge her duties with 'independence, objectivity, and fairness' and without conflicts of interest." *King v. Craig*, 9th Dist. Medina No. 12CA0060-M, 2013-Ohio-3070, ¶ 5, citing Sup.R. 48 (D). But allegations of bias and prejudice will not be sustained where the record demonstrates that the GAL "fulfills her duty to her ward." *Lee v. Starr*, 5th Dist. Licking No. 2019 CA 00094, 2020-Ohio-1649, ¶ 56. And "[d]isagreement with the court's ultimate determination of custody does not demonstrate bias, prejudice, or improper action on the part of the GAL." *Id.* at ¶ 57, citing *King* at ¶ 9.

{¶61} At the hearing, the GAL described her lengthy investigation in this case, which consisted of interviews with J.H.C., Grandmother, step-Grandfather, Mother, C.C., as well as a review of the HCJFS investigation documents and the relevant criminal histories. Significantly, Mother was able to challenge the GAL about the veracity of her report on cross-examination.

{¶62} Regarding Mother's specific claims, the GAL testified that she received information that Grandmother told J.H.C. to "act crazy and run down the street," something Mother discussed with the GAL. The GAL testified that this information factored into her report and the GAL "felt that it was somewhat taken out of context, because at that point [J.H.C.] was staying at somebody's house she didn't know and was [un]comfortable with." And the GAL acknowledged speaking to the HCJFS caseworker and disagreeing with the assessment in her investigative notes. The GAL testified that J.H.C. "didn't have an opportunity to fully speak with the caseworker. Because mother was in the house when she was interviewed by the caseworker."

{¶63} The record indicates that the GAL's investigation was thorough. While the report omitted mention of Grandmother's statements to J.H.C., the GAL testified about what was reported to her and explained that she felt those comments were taken out of context. In other words, the record does not substantiate Mother's assertion of bias. We therefore overrule her third assignment of error.

### III. Conclusion

{¶64} We overrule Mother's three assignments of error and affirm the juvenile court's judgment.

Judgment affirmed.

**BERGERON**, **P.J.**, and **KINSLEY, J.,** concur.

21

Please note:

The court has recorded its entry on the date of the release of this opinion.