[Cite as *In re C.R.*, 2022-Ohio-3540.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: C.R. | : | APPEAL NO. C-210591 |
| | | TRIAL NO. F20-186Z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  October 5, 2022

*James J. Whitfield*, for Appellant Father,

*Berry & Karl LLC* and *B. Bradley Berry,* for Petitioners-Appellees.

**ZAYAS, Presiding Judge.**

{¶1} Appellant father appeals the judgment of the Hamilton County Juvenile Court awarding custody of C.R. to petitioners-appellees ("petitioners"). For the reasons that follow, we sustain father's first assignment of error, reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion and the law.

## Procedural History

{¶2} On February 11, 2020, petitioners–maternal grandfather and his wife–filed a complaint in the juvenile court for nonparent custody of C.R. The complaint asserted that the biological father of C.R. was unknown and stated that C.R. was born a few days prior to the filing of the complaint and was in the NICU for drug withdrawal as he was born addicted to opioids and other drugs. Emergency interim custody was granted to petitioners that same day and extended to petitioners on February 14, 2020. Interim custody of C.R. was granted to petitioners on June 9, 2020. Mother agreed to interim custody to petitioners and provided father's name as the potential father of C.R.

{¶3} On August 19, 2020, father appeared before the juvenile court and said that he planned to establish paternity. Because paternity had not been established, the juvenile court did not grant father any visitation with C.R. An entry from the juvenile court on October 28, 2020, indicated that father had reported to the court that he had filed to establish paternity.

{¶4} On February 25, 2021, father filed a motion for custody of C.R., asserting that he was the established biological father. On March 10, 2021, the matter proceeded to trial before a magistrate solely on petitioners' complaint for custody. The magistrate did not proceed on father's custody motion–instead setting the motion for

2

a pretrial hearing–as the magistrate found that mother was not properly served with father's motion. At the close of trial, the magistrate took the matter under advisement and ordered that father have interim parenting time with C.R. of two hours a week at a public place.

{¶5} On April 14, 2021, the magistrate found that father was an unsuitable parent and ordered that C.R. be placed in the legal custody of petitioners. The magistrate found that father had abandoned C.R. by making no attempt to see C.R. or establish paternity for seven months, despite knowing that mother was pregnant and keeping in contact with mother through the month that C.R was born. The magistrate also found that awarding custody to father would be detrimental to C.R. as C.R. had only known petitioners as his parents and C.R. would continue to have special needs, for which petitioners had more time to provide as father worked 50-60 hours a week.

{¶6} Father filed objections to the magistrate's decision, which were overruled by the juvenile court on October 29, 2021. The juvenile court adopted the decision of the magistrate and found that father had abandoned C.R. by never meeting C.R. before the hearing before the magistrate, despite being offered an opportunity to visit. The juvenile court also found that awarding custody to father would be detrimental to C.R. because father did not have the "time, resources, or insight" to provide the proper care for C.R.'s special needs. Thus, the juvenile court found father to be an unsuitable parent and awarded legal custody of C.R. to petitioners.

{¶7} Father now appeals, asserting two assignments of error for our review. In his first assignment of error, father argues that that trial court erred by placing C.R. in the legal custody of a nonparent where the evidence did not show, by a preponderance of the evidence, that he was an unsuitable parent. In his second

3

assignment of error, father argues that the trial court erred by proceeding to trial on petitioners' custody complaint without also proceeding on his motion for custody.

**Factual Background**

**{¶8}** Grandfather testified that he filed for custody of C.R. after a social worker from University Hospital and someone from the Hamilton County Department of Job and Family Services ("JFS") contacted him and said that C.R. would be placed in foster care if they did not file for custody as mother and her boyfriend–who was present at the hospital and signed as C.R.'s father at the hospital–were unfit due to drug use. Mother did not name a father on C.R.'s birth certificate. Grandfather said that mother had been in a relationship with the boyfriend who was present at the hospital since before the birth of her older son, who was also in the custody of petitioners. He testified that mother and the boyfriend had been homeless and "out on the street" off and on, and that, around the time that C.R. would have been conceived, they were both in "very, very bad shape." He said that, as far as he knew, father had never been mother's boyfriend. He opined that C.R. was conceived as "some kind of trafficking, sex trafficking operation." He said that he was told that mother had been advertised for violent sex by an escort service.

**{¶9}** C.R. was born with Neonatal Abstinence Syndrome ("NAS") and was in the NICU for over a week. Grandfather said that C.R.'s symptoms subsided after about a month or two, and C.R. seemed very healthy and "just like a normal baby." He testified that they had frequent follow-up medical appointments and said that C.R. was "perfect" at his one-year check-up. He expressed that they were very bonded to C.R. and said that it "would not be good" if C.R. was taken from their home.

**{¶10}** Grandfather denied knowing who C.R.'s father was when they filed for custody. He denied that mother ever identified her boyfriend as C.R.'s father. Mother

told him father's first name and he tried to find father online. However, he ultimately found out about father in court. Grandfather testified that he spoke with father about a week prior to the hearing before the magistrate–after father called him–and he offered to pay for father to visit with C.R. at Holly Hill, but father said that he wanted to complete visitation in Cincinnati. This was the first contact he had with father. He said that, because the hearing was only a week away, he thought they should just determine visitation at the hearing with guidance from the court. He denied discussing anything other than visitation with father. Grandfather expressed concerns about father's criminal history, which he viewed through county court records.

{¶11} Grandfather's wife testified that C.R. "required quite a bit of care" when he came home from the hospital. C.R. had torticollis, in addition to NAS, which was treated for many months. They also did virtual physical-therapy appointments. She said that, because of his exposure to drugs, C.R. remained "at risk for developmental delays and physical problems such as hearing loss," and would be in the NAS program until he was at least two years old. She testified that C.R. had passed his hearing test so far but would need a follow-up in six months. C.R. was also exposed to Hepatitis C before birth, which will require a check-up at 18 months of age. She said that, at C.R.'s 12-month checkup, he had met all his developmental goals and screens. However, she expressed that, although C.R. was doing well, he will continue to be at risk for additional complications from the drug exposure. She agreed that she intends to continue providing exercises to C.R. that will assist C.R. with maintaining good posture and avoiding redevelopment of torticollis. She denied having any contact with father.

{¶12} A caseworker from JFS testified that she became aware that father was the alleged father of C.R. at a court hearing in October 2020. When asked if she had

any contact with father between that time and when paternity was established, she said that she talked to father twice but he did not want to be involved until he knew that C.R. was his child. She said that JFS received the results from the paternity test in February, and then she was able to contact father. Regarding father's background, she testified that father did have some arrests and prior convictions, but they were all from over 11 years ago. Father signed a release of information to submit to a drug and alcohol screen, but she never asked him to complete a screen. She visited father's two-bedroom apartment and agreed that it was appropriate. When she was completing the home visit, father's daughter was present. She testified that father's daughter said that father was always supportive of her and her siblings, and that they had a very close relationship. His daughter also said that father's grandchildren were very fond of him and had a really good relationship with father.

{¶13} Father testified that he was 63 years old and worked as a maintenance technician. He said that he had been in this position for eight or nine years and worked on average 50-60 hours per week. He testified that the hours he worked in a day depended on the job and what he wanted to do. He said that he could "make it whatever I want it to be." He denied having health insurance but said that he utilized a free health clinic to see a doctor. He denied any ongoing health disabilities and denied receiving any mental-health services of any kind. He said that he had four children, including C.R., and lived alone in an apartment that he had lived in for the last five or six years. He also said that he owned the home that he grew up in. When asked why he rented an apartment if he owned a home, he explained that he was working on the home.

{¶14} Father testified that he lived with mother for a couple months around June or July 2019. He said that he stopped living with mother because she "became

impossible to deal with" due to her addiction. He also said that mother left because he would not cater to her. He never saw mother use drugs but knew that she was using them. He met mother while she was working as a waitress around May or June 2019. He knew that mother was 33 years old when he met her. He continued to see mother off and on after they separated. He testified that he stayed in contact with mother "because she was pregnant." He said, "So I was trying to keep track of her." He testified that mother became pregnant "within" the two months that they were together. When asked if he suspected that he was the one who "helped" mother get pregnant, he replied, "I just suspected that I was the one to cause her to conceive. I didn't think that I could have kids, anymore kids." He agreed that he talked to mother about the pregnancy. He said, "We conversated, but I still denied that I could have kids." He said that he denied it because of his age and because he had been with other women who did not get pregnant. He testified that he did not have any surgeries that would prevent him from having children.

{¶15} When asked if he continued to have sexual relations with mother after they separated, he replied, "Somewhat – no, not really." He agreed that he continued to communicate with mother. He testified that he was with mother "through the four months that she was pregnant," and then she left and went back to "whoever she was with." When asked if mother told him that she thought he may be "involved" in the pregnancy, he said yes, but said "I didn't think so." He agreed that he knew approximately when the baby was due to be born. He testified that he tried to find mother when she had the baby but could not find her. He was not present at C.R.'s birth. He said that he became aware of C.R.'s birth around June or July of 2020, when C.R. was five or six months old. He agreed that he knew that conception took place during their relationship.

{¶16} Father testified that he saw mother a few times in 2020 when she was at her mother's house. The last time mother was at his residence was in August 2020. When asked if they discussed C.R., he replied, "We did. And I still told her I didn't think it was mine." He filed for paternity in September 2020, completed the DNA test on September 24, 2020, and received the results that he was C.R.'s biological father on February 1, 2021.

### Law and Analysis

{¶17} Under R.C. 2151.23(A)(2), the juvenile court has exclusive original jurisdiction to determine the custody of a child who is not a ward of another Ohio court. The statute "does not state a test or a standard to be used by the juvenile courts in determining child custody cases." *Hockstock v. Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 15. "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." (Citations omitted.) *Id.* at ¶ 16. "Since parents have constitutional rights, any action by the state that affects this parental right, such as granting custody of a child to a nonparent, must be conducted pursuant to procedures that are fundamentally fair." (Citation omitted.) *Id.* "Ohio courts have sought to effectuate the fundamental rights of parents by severely limiting the circumstances under which the state may deny parents the custody of their children." *Id.* at ¶ 17, citing *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus.

{¶18} Accordingly, "[i]n an R.C. 2151.23(A)(2) child custody proceeding between a parent and nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability – that is, without first determining that a preponderance of the evidence shows that the parent

8

abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." *In re Perales* at paragraph one of the syllabus. "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *Hockstock* at ¶ 17. "Only if the trial court determines that a parent is unsuitable, should it then examine which custodial placement would be in the best interest of the child." *In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116, ¶ 4, citing *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 15.

{¶19} "We review a juvenile court's decision to grant legal custody under an abuse-of-discretion standard." *Id.* at ¶ 3. "An abuse of discretion is more than an error of law or judgment; it is a decision that is unreasonable, arbitrary, or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A trial court's decision is unreasonable and may be reversed if it is not supported by competent, credible evidence. (Citations omitted.) *Id.* As stated above, the burden in the trial court is a preponderance of the evidence. *See In re Perales* at paragraph one of the syllabus; *accord In re P.M.*, 8th Dist. Cuyahoga No. 109968, 2021-Ohio-3358, ¶ 38. " ' "Preponderance of the evidence" means "evidence that's more probable, more persuasive, or of greater value." ' " (Citation omitted.) *In re P.M.* at ¶ 38.

{¶20} Father disputes the trial court's finding that he abandoned C.R. Abandonment has been defined as "any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 12, citing *Baker v. Rose*, 28 Ohio Misc. 200, 203, 270 N.E.2d 678

9

(C.P.1970), and *In re Masters*, 165 Ohio St. 503, 505-506, 137 N.E.2d 752 (1956). "For purposes of [R.C. Chapter 2151], a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C).

**{¶21}** This court has held that the presumption of abandonment is not rebutted "by the mere fact that a father had not established paternity during the period when he did not visit the child." *In re K.T.1*, 2018-Ohio-4312, 121 N.E.3d 847, ¶ 79 (1st Dist.), citing *In re K.R.*, 12th Dist. Warren Nos. CA2017-02-015, CA2017-02-019 and CA2017-02-024, 2017-Ohio-7122, ¶ 32-33. Thus, the legal status of the parent is not always determinative in this regard; the conduct and belief or knowledge of the parent in relation to the child may also be considered when determining whether a parent has abandoned his or her child. For example, in *In re K.T.1*, we affirmed the trial court's determination of abandonment where paternity had not been established, but the evidence showed that the father believed that the children were his children and had held the children out as his own for several years but failed to maintain contact with the children. *Id.* at ¶ 76-79. In *In re B.J.*, the Fifth District affirmed the trial court's determination of abandonment where paternity had not been established, but the father was involved with the pregnancy and birth of the child and had a relationship with the child before the period of abandonment. *In re B.J.*, 5th Dist. Stark No. 2011-CA-00277, 2012-Ohio-1913, ¶ 13, 38. Similarly, in *In re K.R.*, the father had recognized that he was the father of the child and had visited with the child a few times, so the court found that the father had taken "minimal steps to exercise [his parental rights]" and determined that father had abandoned the child. *In re K.R.* at ¶ 32-33.

**{¶22}** Here, father did not acknowledge or accept that C.R. was his child nor did he hold himself out to be C.R.'s father prior to the results of the paternity testing. Father's testimony was that he did not believe that C.R. was his son because he did not think he could have any more children due to his age and previous experiences with other women. Father also said that he told mother several months after C.R.'s birth that he did not think C.R. was his child. There was no adverse credibility determination made by the magistrate regarding father's testimony. Father filed for custody of C.R. the same month that paternity was established. For these reasons, we hold that the trial abused its discretion in finding that father had abandoned C.R.

**{¶23}** Because we find that the trial court abused its discretion in finding that father had abandoned C.R., we also find that the trial court abused its discretion in making the premature additional finding that awarding custody to father would be detrimental to C.R. as the court relied heavily on the fact that C.R. did not know father. Notably, the hearing before the magistrate occurred only weeks after paternity had been established and before the court had ordered that father could have any visitation with C.R. It was the petitioners' burden to establish that custody to father would be detrimental to C.R. and, while some of the evidence in the record may have caused doubt regarding certain issues relevant to father's ability to suitably parent C.R., there was insufficient evidence in the record of the sort required to establish that awarding custody to father would in fact be detrimental to C.R. *See generally In re T.G.*, 2d Dist. Montgomery Nos. 29327 and 29328, 2022-Ohio-1521, ¶ 65-67. In the interest of fundamental fairness, father is entitled to a hearing that adequately considers his ability to parent C.R., without the cloud of the abandonment finding. We caution that the suitability test does not include a comparison of potential placements; rather, the test is solely focused on whether father is a suitable parent–not whether someone else

11

is more suitable. *See, e.g., In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116, at ¶ 13-14.

### Conclusion

**{¶24}** For the foregoing reasons, we sustain father's first assignment of error. Because our disposition of the first assignment of error renders father's second assignment of error moot, we decline to address it. We reverse the judgment of the trial court and remand the cause for the trial court to conduct a new hearing to determine whether custody to father would be detrimental to C.R.

Judgment reversed and cause remanded.

**BERGERON** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.