# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: R.K. and K.K.          :       APPEAL NO.   C-250222
                                         TRIAL NO.     F/20/660 X

                                    :

                                    :            *JUDGMENT ENTRY*

                                    :

This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 7/30/2025 per order of the court.**

**By:**_____

        **Administrative Judge**

[Cite as *In re R.K.*, 2025-Ohio-2670.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: R.K. and K.K. | : | APPEAL NO. C-250222 |
| | | TRIAL NO. F/20/660 X |
| | : | |
| | : | *O P I N I O N* |
| | : | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 30, 2025

*Jon Sinclair*, for Appellant Maternal Grandmother,

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*ProKids, Inc.*, and *Paul Hunt*, for Appellee Guardian Ad Litem of R.K. and K.K.

**MOORE, Judge.**

**{¶1}** Appellant, maternal grandmother ("grandmother") appeals the juvenile court's denial of her petition for legal custody. For the reasons stated herein, we affirm the juvenile court's judgment.

## I. Factual and Procedural History

**{¶2}** On April 8, 2020, S.K. ("Mother"), K.K., and four of her siblings (who are not at issue in this appeal) were found sleeping in a car at a Cincinnati/Northern Kentucky International Airport parking lot. Mother, who had a history of mental-health issues, presented as manic depressive and unstable and was placed on an involuntary psychiatric hold on that date. For the nearly two weeks that Mother was hospitalized, the children were placed with grandmother.

**{¶3}** After Mother's discharge from the hospital, the Hamilton County Department of Job and Family Services ("JFS") could not locate her, the children, or grandmother. JFS was eventually notified that Mother and the five children were living at Bethany House Services, a homeless shelter.

**{¶4}** On June 30, 2020, Mother was expelled from Bethany House Services for failing to control her children and abide by the rules. Law enforcement had to assist JFS in the removal of the children. That day, JFS filed an ex parte Emergency Order of Custody for K.K. and the other four children. The agency filed a "Motion for Interim Custody" and "Complaint for Temporary Custody" on July 1, 2020. The complaint alleged the children were neglected and dependent.

### R.K. is added to, then removed from, the case.

**{¶5}** JFS discovered R.K. was living with grandmother and another sibling who is not at issue in this appeal. On September 21, 2020, JFS filed a complaint for interim custody of R.K. and amended its prior complaint for custody by adding her to

the case. JFS later requested to have its motions regarding R.K. withdrawn on September 22, 2020, and November 4, 2020, respectively, because grandmother held guardianship of R.K. through a previous probate court order.

**{¶6}** Meanwhile, the juvenile court granted JFS temporary custody of K.K.

<u>Grandmother moves for custody of K.K.</u>

**{¶7}** Grandmother filed a motion for custody of K.K.[1] on October 30, 2020, which was later dismissed on the court's own motion on March 22, 2022. Grandmother also filed a motion for custody of K.K. on November 29, 2021. Instead of addressing grandmother's motion, the court opted to extend JFS's temporary custody of K.K.

**{¶8}** The November 15, 2021 report from JFS's semiannual administrative review ("SAR") reflected that Mother proposed grandmother as caregiver for K.K., noting that two other children—one being R.K.—were already in grandmother's care. With grandmother's custody petition pending, the magistrate ordered JFS to conduct a home-study investigation on grandmother's home in December 2021.

<u>JFS again adds R.K. to the complaint for temporary custody.</u>

**{¶9}** On February 19, 2022, JFS was granted an ex parte Emergency Order of Custody of R.K. On February 22, 2022, JFS filed a complaint seeking temporary custody of R.K. The complaint alleged R.K. to be dependent as she had been residing with Mother due to grandmother's hospitalization and it was uncertain when grandmother would be discharged. In addition, Mother reported that her paramour had committed domestic violence against her while R.K. was present. R.K. was placed in JFS's interim custody.

---

[1] With the exception of the October 4, 2022 and November 15, 2023 motions, grandmother's motions for custody included other siblings.

{¶10} The guardian ad litem ("GAL") for the children and court appointed special advocate ("CASA") supported JFS's temporary custody motion pertaining to R.K.

### The June 2022 SAR report.

{¶11} A June 23, 2022 SAR report stated that grandmother expressed concern that the children were being "coached" and that R.K. cried a "great deal" during visits with grandmother. The report also noted the domestic-violence incident between Mother and her paramour that occurred in the children's presence. Grandmother indicated she would be discharged from the hospital in six weeks, and she would engage in counseling with the children.

### JFS moves for permanent custody of K.K.

{¶12} On May 25, 2022, JFS filed a motion to modify its complaint from temporary custody of K.K.[2] to permanent custody, and then modified the complaint on September 12, 2022, to add alleged father, J.B. Although the reasons are not clear from the record, on July 6, 2022, a GAL was appointed to represent Mother.

### Grandmother files a second set of petitions for custody.

{¶13} On October 4, 2022, grandmother filed motions for custody of R.K. and K.K., respectively.

{¶14} R.K. was adjudicated dependent on November 4, 2022 and committed to JFS's temporary custody on November 16, 2022. Instead of addressing grandmother's custody petitions, the magistrate granted JFS's first motion to extend temporary custody of R.K. on January 19, 2023.

---

[2] An *In re Williams* attorney was appointed to represent K.K. on July 6, 2022. Although the record is not clear as to what prompted this appointment, K.K. was a party to the parental termination proceedings and had the right to independent counsel to represent her legal interests and protect her constitutional and other legal rights. *See In re Williams*, 2004-Ohio-1500, ¶ 16-21, 25, 29.

**{¶15}** The December 29, 2022 SAR reflected that grandmother was in the process of completing a home study, which "appear[ed] to be going well," and an Interstate Compact on the Placement of Children ("ICPC") evaluation. *See* R.C. 5103.23(C). The SAR noted that K.K. was doing well in her foster placement and expressed that she did not want to live with grandmother.

**{¶16}** The SAR noted that R.K. was doing well in her foster placement as well. R.K. was beginning to recognize grandmother during visits. The April 24, 2023 joint report of the GAL and the CASA requested that grandmother engage in family therapy with the children when appropriate and visit R.K. on weekends.

### JFS files second motion to extend temporary custody of R.K.

**{¶17}** JFS filed its second motion to extend temporary custody of R.K. on June 27, 2023, which was granted on September 26, 2023.

### Grandmother's issues in bonding with R.K. and K.K.

**{¶18}** A November 2, 2023 SAR report reflected that grandmother did not "understand or empathize with the difficulty [R.K.] experience[d] during transitions" during weekend visits with her, and "minimize[d] [K.K.'s] feelings." Both children were again reported to be bonded to their respective foster families. Although R.K. did not report "severely negative things occurring during visits" with grandmother, she reported not having her teeth brushed or taking baths. R.K. reportedly would talk about "some things," but did not want to talk about grandmother. JFS reported it would continue to assess R.K.'s progress toward reunification with grandmother "as they work through their current barriers with therapy." JFS stated that grandmother was expected to demonstrate her ability to empathize with R.K. and to continue to engage with JFS.

**{¶19}** K.K. was reported to be "vocal and expresse[d] what she wants" and was

6

"attached to foster mother." K.K. also expressed wanting to remain with her foster mother if she could not be reunified with Mother, and she did not want to be with grandmother.

**{¶20}** The GAL and CASA filed a joint report supporting the grant of permanent custody of K.K. to JFS. The report reflected K.K.'s bond to her foster family and her wish to remain there, and that K.K. expressed that she did not want to return to her mother's care or be placed with grandmother. The report further stated that grandmother "has had [K.K.'s] siblings removed from her home," and, as reflected in the magistrate's June 26, 2023 entry, grandmother's home study was not approved for custody of K.K.

<u>Grandmother files a petition for custody of K.K.
and JFS moves for permanent custody of R.K.</u>

**{¶21}** Grandmother filed another motion for custody of K.K. on November 15, 2023. Then, on January 24, 2024, JFS filed a motion to modify its complaint regarding R.K. to seek permanent custody.

<u>Grandmother moves to have R.K. removed from foster care.</u>

**{¶22}** On January 24, 2024, grandmother filed a "Motion to Remove Child from Foster Care." In her motion, grandmother alleged R.K.'s foster parents were disrespectful toward her, lied about her, told R.K. that they were adopting her, were teaching R.K. inappropriate ways to dance and discuss human anatomy, and had inappropriate discussions with R.K. regarding sexuality.

**{¶23}** Following a hearing, the magistrate denied grandmother's motion to remove R.K. from foster care in an entry dated February 1, 2024. While the entry reflects that the hearing discussed K.K. and not R.K., grandmother's subsequent objection to the magistrate's decision regarded only R.K. In her objection,

7

grandmother asserted that the magistrate did not consider R.K. being exposed to inappropriate behavior and having bruising on her face.

**{¶24}** The juvenile court, in ruling on the objection, considered the written argument submitted by grandmother, the written argument jointly submitted by the children's GAL and CASA, and the fact that grandmother did not submit a transcript of the motion hearing. Due to the absence of the transcript, the juvenile court presumed the regularity of the proceedings. In so doing, it concluded that the magistrate properly determined the factual issues and appropriately applied the law. The court overruled grandmother's objection in an April 9, 2024 entry.

<u>SAR and GAL/CASA pretrial reports.</u>

**{¶25}** The case plans filed on March 26 and 27, 2024[3] stated that the agency was working toward reunifying R.K. with grandmother. The March 27, 2024 SAR report stated that grandmother was referred for intensive in-home services with R.K. and K.K. R.K. visited with grandmother from Sundays through Tuesdays. The SAR reported that R.K. continued to struggle with transitioning between her foster home and visits with grandmother, but she was improving. R.K. was reportedly experiencing separation anxiety but otherwise was described to be a "happy and active" child.

**{¶26}** K.K. maintained that she had no desire to visit grandmother.

**{¶27}** The June 16, 2024 joint report of the GAL and CASA supporting JFS's permanent custody motion stated that, while R.K. "appear[ed] comfortable in [grandmother's] home," R.K. stated that she did not wish to live with grandmother or return to her mother's care. R.K. wished to remain with her foster parents, who were willing to adopt her. R.K. had been in the agency's temporary custody for 25

---

[3] The March 26 filing was an update to remove three other siblings from the case plan, and the March 27 filing updated the case plan to approve R.K. to travel with foster parents.

continuous months. Although grandmother filed a motion for custody of R.K., she had not completed recommended family therapeutic services and had been discharged from the National Youth Advocate Program ("NYAP") due to lack of participation.

R.K.'s refusal to visit with grandmother.

**{¶28}** The case plan was updated on May 20, 2024 to reflect that grandmother had requested to have her unsupervised visits with R.K. moved from her home to a supervised facility setting, citing ongoing conflict between the foster parents and herself as the reason. At that point, the parties were doing pick-up and drop-off of R.K. at the police station.

**{¶29}** An example of this ongoing conflict occurred on April 17, 2024, when R.K. witnessed grandmother and the foster parents "exhang[e] words" after grandmother confronted the foster parents about their physical discipline of R.K. A recording captured the exchange as it occurred in R.K.'s presence. R.K. later reportedly had a "very intense" reaction and began crying, screaming, and ran behind a JFS caseworker when she saw grandmother during a May 3 visit. The JFS caseworker who was permanently assigned to the family found R.K. hiding behind a desk upon her arrival. The visit was canceled as staff attempted to calm R.K.

**{¶30}** The updated case plan stated R.K. again cried during the rescheduled visit. R.K. reportedly did not want to see grandmother because she "is mean and says bad words." When the caseworker attempted to take R.K. to grandmother, the child "jumped off [the caseworker's] shoulders and ran away to where another worker had to intervene and catch her." This visit was also canceled after R.K. repeatedly stated she did not want to visit with grandmother. JFS decided to seek supervised visits while therapeutic services were restarted to "work on [grandmother] and R.K.'s relationship."

**{¶31}** On September 17, 2024, nine days before the trial, grandmother filed another motion to have R.K. removed from foster care.

The Trial.

**{¶32}** The trial on the motions for permanent custody occurred over three separate days, commencing on May 23, 2024, continuing September 26, 2024, and concluding on October 7, 2024. At trial, the court considered grandmother's only outstanding custody petition, which regarded K.K.

**{¶33}** Grandmother testified that K.K. lived with her off-and-on from February through July or August of 2020. R.K. lived with grandmother from 2019 when she was five months old until grandmother was hospitalized in February 2022. Grandmother was R.K.'s legal guardian, but Mother also lived with grandmother until July or August 2020 when grandmother made her leave the home.

**{¶34}** Grandmother testified that Mother physically assaulted her while Mother was visiting the children at grandmother's home. Grandmother also explained the negative relationship and interactions with R.K.'s foster parents, which led to her request that they exchange R.K. at a police station for visits.

**{¶35}** Grandmother testified that, within six weeks after visits with R.K. were moved to JFS in May 2024, R.K. began to act like she was terrified of her as if she were a "monster." Grandmother denied physically disciplining R.K. or screaming or yelling at her.

**{¶36}** Caseworker Barkley testified that R.K. had "felt this way [toward grandmother] for a while" and seemed to be able to vocalize her feelings in the previous six months because she was older. Barkley recounted grandmother's assertions that the agency had brainwashed the children.

**{¶37}** Barkley further testified that a kinship home study could not be done

regarding R.K., as with K.K., because grandmother was R.K.'s last legal custodian. Barkley explained that, since a kinship home study could not be done regarding R.K., the "Match Committee" would be tasked with determining whether R.K. should be placed with grandmother if R.K. were committed to JFS's permanent custody.

**{¶38}** According to Barkley, the home study pertaining to K.K. was denied largely due to K.K.'s "very clear" refusal to have contact with grandmother; K.K. had gone as far as stating she would "show any form of defiance if [JFS] would ever put [her and grandmother] in contact with each other." Barkley testified that K.K.'s behavior improved once she was allowed to forego visits with grandmother, whom K.K. had not seen since 2022 when the physical altercation between grandmother and Mother occurred.

**{¶39}** Caseworker Barkley further testified that grandmother's diagnostic assessment diagnosed her with major depressive disorder and personality disorder, and individual therapy was recommended. She stated that NYAP did not integrate R.K. into grandmother's therapy due to concerns about her mental health. Barkley recalled that grandmother was unsuccessfully discharged from NYAP twice, with the second time being due to her refusal to allow R.K.'s sibling, whom grandmother had custody of, to participate in sessions.

**{¶40}** Caseworker Mendoza explained the difficulties the JFS staff and the foster parents experienced with getting R.K. to visit with grandmother. Mendoza also testified that R.K. overheard grandmother saying "inappropriate things" about R.K. Mendoza further testified that grandmother had told R.K. that her foster mother—whom R.K. viewed as her mother—was not her mother, which upset R.K. As reflected in the previously filed reports, testimony reflected that K.K. and R.K. were bonded to their respective foster families.

11

**{¶41}** On August 12, 2024, JFS filed a motion for an in-camera interview for K.K., which the magistrate conducted after the conclusion of trial on October 15, 2024.

<u>The magistrate grants JFS's motions for permanent custody of R.K. and K.K.</u>

**{¶42}** The entry detailed the magistrate's findings in concluding that granting JFS permanent custody of K.K. and R.K. was in the children's best interests. The magistrate determined the children had been in the temporary custody of JFS for at least 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d).

**{¶43}** In considering the factors under R.C. 2151.414(D)(1) as it pertained to the parents, the magistrate also found the children were not bonded to grandmother; K.K. did not want "contact of any sort with [grandmother]" and R.K. was "terrified of [grandmother]." *See* R.C. 2151.414(D)(1)(a). Neither child "wished to be reunified with their family." K.K. reportedly did not want to be placed in grandmother's custody because she recalled "what being around [grandmother] was like in the past and [did] not want to be subjected to continued abuse and maltreatment." *See* R.C. 2151.414(D)(1)(b). The GAL did not support granting custody of either child to grandmother. *See id.* The magistrate determined K.K. had been in the agency's care for 42% of her life, and R.K. had been in the agency's care for 54% of her life. *See* R.C. 2151.414(D)(1)(c).

**{¶44}** The magistrate found the children's need for a legally secure placement could not be achieved without granting permanent custody to JFS. *See* R.C. 2151.414(D)(1)(d). The entry stated that grandmother's actions "thwarted" reunification efforts with R.K. The magistrate noted the physical altercation that erupted between Mother and grandmother in K.K.'s presence. The entry also cited the incident where grandmother left R.K. in Mother's care while grandmother was

hospitalized, during which R.K. witnessed domestic violence perpetrated against Mother.

**{¶45}** The entry discussed in detail the concern with grandmother's refusal to engage in therapy services unless she could choose the provider, minimal participation with NYAP, and refusal to allow other family members to participate. The magistrate further found that grandmother endorsed not being forthright with treating professionals, she believed they were conspiring against and spying on her, and she had been unsuccessfully discharged from services numerous times. The magistrate determined grandmother did not exhibit the behavioral changes necessary to have the children placed with her, noting concerns with the stability of grandmother's mental health and the safety and well-being of the children while they were in her care. The entry reiterated that R.K. is terrified of grandmother and has acted out in response to this fear, having to be coaxed into the building for visits and comforted in the process.

**{¶46}** The magistrate denied grandmother's custody motion pertaining to K.K.

<u>Grandmother objects to the magistrate's decision.</u>

**{¶47}** Grandmother asserted that the evidence did not support the magistrate's finding that a legally secure placement could not be achieved by granting custody of K.K. to her. She disputed the magistrate's findings of fact as to her engagement in therapy, that her own actions "thwarted" her reunification with R.K., her paranoia with the agency and therapy services, and that she put her own needs above R.K.'s. Grandmother further refuted the magistrate's findings that neither child could nor should be placed with either parent within a reasonable time.

<u>The Juvenile Court's Entry.</u>

**{¶48}** The juvenile court's entry stated that it "reviewed the docket of prior

13

proceedings before this Court, transcripts, exhibits admitted into evidence, and the written arguments of the parties." The entry further stated that the magistrate correctly stated that R.C. 2151.353(A)(4) permits the juvenile court to grant legal custody of a child who had been committed to the permanent custody of JFS "to either parent or another person," and, in doing so, certain conditions under R.C. 2151.414(D) and R.C. 3109.04(F)(1) must be satisfied.

**{¶49}** The juvenile court opted to supplement the magistrate's decision by analyzing whether grandmother should obtain legal custody of K.K. and R.K. as provided by R.C. 2151.353(A)(3) and, as discussed below, the best-interest factors under R.C. 3109.04(F)(1). The court, "[b]ased upon consideration and an independent review[,]" denied grandmother's objection to the magistrate's decision and approved and adopted the magistrate's order as supplemented with the court's additional analysis.

**{¶50}** Grandmother now timely appeals, asserting in a single assignment of error that the juvenile court erred by denying her petition for legal custody.

## II. Analysis

**{¶51}** A juvenile court may award legal custody of an abused, neglected, or dependent child to a nonparent who files a motion for legal custody, as an alternative to an award of permanent custody. *In re B.R.F.*, 2025-Ohio-2061, ¶ 17 (1st Dist.); R.C. 2151.353(A)(3), (4). The court's decision is based on its determination of the best interest of the child. The statute does not require the juvenile court to consider any specific criteria, but this court has held that the court may be guided by the best-interest factors as set forth in R.C. 2151.414(D) and R.C. 3109.04(F), to the extent applicable. *In re B.R.F.* at ¶ 17, citing *In re A.F.*, 2020-Ohio-5069, ¶ 35-36 (1st Dist.).

**{¶52}** The juvenile court's factual findings with respect to the legal-

custody petition must be supported by a preponderance of the evidence, and this court reviews a juvenile court's decision on a petition for legal custody for an abuse of discretion. *In re M.S.,* 2025-Ohio-1194, ¶ 17 (1st Dist.). "Preponderance of the evidence" is evidence that is more probable, more persuasive, or of greater value. *In re C.R.,* 2022-Ohio-3540, ¶ 19 (1st Dist.); *see Cawrse v. Allstate Ins. Co.,* 2009-Ohio-2843, ¶ 29 (1st Dist.) (in considering the quality of the evidence, a preponderance is the evidence that is believed because it outweighs or overbalances the evidence opposed to it). A court abuses its discretion when its judgment is unreasonable, unconscionable, or arbitrary. *In re M.S.* at ¶ 17. A court's decision regarding a child's best interest, therefore, must be supported by competent, credible evidence. *Id.* A decision not based on such evidence is unreasonable and must be reversed.

### A. *The record supports the juvenile court's decision to grant JFS's permanent-custody motions.*

{¶53} Grandmother asserts the trial court did not conduct an independent analysis as to whether a legally secure placement could be achieved without granting permanent custody to JFS under R.C. 2151.414(D)(1)(d). The juvenile court's entry reflects otherwise. In conducting its independent analysis as it pertains to granting legal custody of a child after he or she has been committed to the permanent custody of JFS, it considered the statutory conditions that must be met under R.C. 2151.414(D), followed by conducting a best-interest analysis. The juvenile court then adopted the magistrate's decision and incorporated the magistrate's R.C. 2151.414(D)(1) analysis word-for-word into its entry. As acknowledged by grandmother, the magistrate addressed each factor, including R.C. 2151.414(D)(1)(d).

Grandmother does not have standing to challenge the permanent custody judgment.

**{¶54}** Regardless, grandmother has no standing to challenge the permanent custody judgment on appeal. Rather, she may only challenge the juvenile court's denial of her petition for custody because "[r]elatives seeking custody of a child do not have the same rights as natural parents" and "thus they cannot challenge a juvenile court's ruling" in the termination of parental rights. *In re E.H.*, 2022-Ohio-4701, ¶ 9 (1st Dist.), quoting *In re L & M Children*, 2019 Ohio App. LEXIS 689, 21-22 (1st Dist. Feb. 22, 2019). Neither parent objected to the juvenile court's decision to grant permanent custody to JFS or raised an issue on appeal. We, therefore, need only address the juvenile court's decision as it pertains to grandmother's custody petition.

The juvenile court conducted the appropriate analyses.

**{¶55}** After JFS's permanent-custody motion was granted, the juvenile court conducted the appropriate analyses regarding whether to place the children with grandmother. The entry reflects that it independently reviewed the record and acknowledged it must consider the factors under R.C. 2151.414(D) and R.C. 3109.04(F)(1).

**{¶56}** The applicable factors in R.C. 2151.414(D)(1)(a)-(e) are met. Specifically, the children are strongly bonded to their respective foster families and the GAL supported the grant of permanent custody to JFS. R.C. 2151.414(D)(1)(a)-(b). Notwithstanding grandmother's assertion that the children once lived with her, the evidence did not show they had a strong bond with her. In fact, the record reflects the children's refusal to interact with grandmother. *See id.* Each child had been in the temporary custody of JFS for the requisite 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c). The children were in need of a legally secure placement due to Mother's inconsistent engagement in case-plan services and each

16

father's failure to engage in case-plan services. R.C. 2151.414(D)(1)(d). Further, the juvenile court had concerns regarding grandmother's behavior and mental health, her belief that she did not need therapy, her refusal to engage in therapy through NYAP, and her paranoia that her reunification with the children was being sabotaged. Additionally, grandmother's home study regarding K.K. was denied, and placement regarding R.K. was subject to the postpermanent-custody process. While R.C. 2151.414(D)(1)(e) did not apply to grandmother, the juvenile court found Mother and father abandoned the children.

{¶57} The juvenile court then considered the best-interest factors in R.C. 3109.04(F). It first determined that grandmother complied with the provisions in R.C. 2151.353(A)(3) by filing petitions seeking legal custody of R.K. and K.K. prior to the dispositional hearing, affirming her intention to become the children's legal custodian, and, pursuant to R.C. 2151.353(A)(3)(d), attending the dispositional hearing to "affirm that [she understood] the effect of the custodianship before the Court" and to "answer any questions that the Court or any parties to the case may have."

{¶58} The court then considered: (1) the wishes of the children's parents, (2) the magistrate's in-camera interview with K.K., (3) the children's lack of bond with their respective fathers, K.K.'s wish not to return to her Mother and R.K. not having a strong bond with her, and the children's refusal to interact with grandmother, (4) that the children were thriving in their respective foster homes and bonded with their foster families, (5) Mother's and grandmother's mental-health challenges and their inconsistency in engaging in services, and (6) the progress the children were making with their therapy. *See* R.C. 3109.04(F)(1)(a)-(e). The court found the factors in R.C. 3109.04(F)(1)(f)-(j) were not applicable in this matter.

{¶59} The court, therefore, agreed with the magistrate's "well-reasoned

analysis" that granting grandmother custody of R.K. and K.K. was not in their best interests under R.C. 3109.04(F)(1).

### III.   Conclusion

**{¶60}** Contrary to grandmother's assertion, the juvenile court considered whether a legally secure placement could be achieved without the grant of custody under R.C. 2151.414(D)(1)(d) and incorporated the magistrate's findings. The court also found that granting legal custody to grandmother was not in the children's best interests. The court did not abuse its discretion where the evidence supports its findings.

**{¶61}** We, therefore, overrule grandmother's sole assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.