[Cite as *In re J.L.*, 2026-Ohio-1216.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: J.L.                          :          APPEAL NO.    C-250036
                                                TRIAL NO.     F/11/2702 Z
                                     :
                                                *JUDGMENT ENTRY*
                                     :

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/3/2026 per order of the court.**

**By:**_____
          **Administrative Judge**

[Cite as *In re J.L.*, 2026-Ohio-1216.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: J.L.                  :          APPEAL NO.    C-250036
                                     TRIAL NO.     F/11/2702 Z

                                :

                                           *O P I N I O N*

                                :


Appeal From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: April 3, 2026


Appellant Father, pro se,

*Legal Aid Society of Greater Cincinnati* and *Ivory McGuire*, for Appellee Grandmother.

**ZAYAS, Presiding Judge.**

{¶1} In this pro se appeal concerning a custody dispute between a parent and a nonparent, father challenges the juvenile court's decision awarding custody of J.L. to maternal grandmother. In seven assignments of error, he challenges the juvenile court's authority to issue interim-custody orders in the best interest of J.L. pending resolution of the legal-custody matter, challenges the juvenile court's decision finding him unsuitable as a parent, and challenges the juvenile court's denial of his Civ.R. 60(B) motion for relief from the custody judgment. For the reasons that follow, we decline to address father's first, second, third, and fourth assignments of error as moot, overrule the fifth, sixth, and seventh assignments of error, and affirm the judgments of the juvenile court.

## *I. Background*

{¶2} On January 4, 2023, maternal grandmother filed a petition for custody of J.L. The petition said that mother—the custodial parent of J.L.—was now deceased, and stated, "Grandmother has been caretaker for mother and grandchildren for the last four years without assistance." The petition listed father as J.L.'s father but said that father's mailing address was unknown.

{¶3} That same day, grandmother filed a request for an emergency hearing. The affidavit supporting the motion stated,

> Mother passed away leaving three children without [a] legal custodial parent in place. Maternal grandmother has had Grand parents [sic] rights as Power of Attorney since May of 2020. Grandmother continued to provide care and support in areas of school, medical, and financial support of her grandchildren. Grandmother needs legal documentation to apply for services such as JFS, OWF, KPI,

3

PRC, KinShip Care and Housing for her Grandchildren.

{¶4} Grandmother also filed an affidavit for service by publication, in which she swore that father's address was unknown to her and could not be obtained with reasonable diligence. She further swore that she had made efforts via social media to learn father's address.

{¶5} The matter came before the juvenile court magistrate that same day. In the order from that day, the magistrate denied grandmother's request for an emergency order, finding no imminent risk of harm. However, the magistrate granted interim custody of J.L. to grandmother, and authorized grandmother to enroll J.L. in school and make medical and parental decisions for J.L.

{¶6} On May 11, 2023, father filed a petition for custody of J.L. The petition stated,

I am [J.L.]'s biological father. Her mother is deceased. I can provide stability and the most probable path of nutureing [sic] the emotional drawbacks from the loss of her mother. I plan to instill the discipline, love and structure needed to help my daughter, [J.L.], grow into a successful young woman. I am very excited and I am motivated to have a great relationship with [J.L.], and to help her achieve her goals.

{¶7} After mediation between the parties was unsuccessful, the matter came before the magistrate on June 23, 2023. The order from that day states, "Father is requesting a hearing regarding [grandmother]'s grant of Interim Custody, stating he did not have a chance to contest in a full hearing the Ex Parte grant of Interim Custody to [grandmother]. The Court sets the matter for an in-person hearing on that issue."

{¶8} A two-day hearing on this issue occurred on August 7 and 8, 2023, and an in-camera interview with J.L. was held on August 24, 2023. The magistrate entered

4

a decision on October 3, 2023, again finding that interim custody to grandmother in January 2023 was in J.L.'s best interest. The magistrate found that a second hearing (a non-ex parte hearing) should have been held before interim custody was granted to grandmother as grandmother could have easily found father's address and provided it to the court. However, the magistrate further found that, regardless, J.L. had just lost her mother at the time and had been living with mother and grandmother for at least two years while mother was ill. Further, J.L. did not have a "solid relationship" with her father at that time. Therefore, the magistrate found that it was in J.L.'s best interest to continue living with grandmother "in the home where she had been living, so that her regular routine could remain the same during a time when she was grieving the loss of her mother." The juvenile court approved and adopted the magistrate's decision on October 26, 2023.[1]

{¶9} A hearing on the competing custody motions was held on December 4, 2023, and an in-camera interview with J.L. was conducted on December 28, 2023. On February 6, 2024, the magistrate entered a decision granting legal custody to grandmother. The magistrate first found father to be an unsuitable parent because he abandoned J.L. and because custody to father would be detrimental to J.L. "as she would be removed from the only family that she has ever known." The magistrate then found that custody to grandmother was in J.L.'s best interest.

{¶10} Father objected to the magistrate's decision. The juvenile court heard oral arguments on February 16, 2024, and entered a decision on September 24, 2024, overruling father's objections and approving and adopting the decision of the

---

[1] Father did not timely file objections to the magistrate's October 3, 2023 decision. Rather, in June 2024, he filed a motion for leave to file belated objections to the magistrate's decision. However, after finding that father filed the objections over nine months after the filing of the magistrate's decision, the juvenile court overruled the objections as untimely in its September 24, 2024 entry.

magistrate. The court supplemented the magistrate's decision with an added finding that father "failed to make an earnest attempt to build a relationship with J.L. at all until mother's passing." The court said, "Due to the lack of communication and engagement in the child's life, Father's failure to mitigate these issues and his failure to assert his legal rights through the court, the court finds an award of custody to Father would be detrimental to the child."

{¶11} Following the trial court's decision, father filed two requests for findings of fact and conclusions of law, a motion to reconsider, and a motion for a new trial under Civ.R. 59. The juvenile court denied father's request for reconsideration and for a new trial and found that father's requests for findings of fact and conclusions of law were moot. Father appealed.

{¶12} Thereafter, father filed a motion for relief from the custody judgment under Civ.R. 60(B), and this court remanded the matter to the trial court to address the motion. On remand, the juvenile court denied father's request, finding that father failed to set forth operative facts warranting relief. Father then amended his notice of appeal, adding the juvenile court's decision denying his request for relief from the custody judgment.

{¶13} Father now raises seven assignments of error for this court's review, in which he challenges the juvenile court's authority to issue interim-custody orders in the best interest of J.L. pending resolution of the legal-custody matter, the juvenile court's decision finding him unsuitable as a parent, and the juvenile court's denial of his Civ.R. 60(B) motion for relief from the custody judgment.

## II. Law and Analysis

{¶14} Under R.C. 2151.23(A)(2), juvenile courts have exclusion jurisdiction "to determine the custody of any child not a ward of another court of this state." "This

6

includes 'custodial claims brought by the persons considered nonparents at law.'" *Rowell v. Smith*, 2012-Ohio-4313, ¶ 14, citing *In re Bonfield*, 2002-Ohio-6660, ¶ 43.

**{¶15}** R.C. 2151.23(A)(2) "does not state a test or standard to be used by the juvenile courts in determining custody cases." *Hockstok v. Hockstok*, 2002-Ohio-7208, ¶ 15. "[T]he overriding principle in custody cases between a parent and a nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Id.* at ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "This is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution." *Id.*, citing *Santosky* at 753, and *In re Shaeffer Children*, 85 Ohio App.3d 683, 689-690 (3d Dist. 1993).

**{¶16}** "Since parents have constitutional custodial rights, any action by the state that affects this parental right, such as granting custody of a child to a nonparent, must be conducted pursuant to procedures that are fundamentally fair." *Id.*, citing *Santosky* at 754, and *In re Adoption of Mays*, 30 Ohio App.3d 195, 198 (1st Dist. 1986).

**{¶17}** "Ohio courts have sought to effectuate the fundamental rights of parents by severely limiting the circumstances under which the state may deny parents the custody of their children." *Id.* at ¶ 17, citing *In re Perales*, 52 Ohio St.2d 89 (1977).

Accordingly, [the Ohio Supreme Court] has held that in a child custody proceeding between a parent and a nonparent, a court may not award custody to the nonparent "without first determining that a preponderance of the evidence shows that the parent abandoned the child; contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or

7

that an award of custody to the parent would be detrimental to the
child."

*Id*., citing *Perales*. "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *Id*. "Thus, a finding of parental unsuitability has been recognized by this court as a necessary first step in child custody proceedings between a natural parent and nonparent." *Id*. at ¶ 18.

### A.  First, Second, Third, & Fourth Assignments of Error

**{¶18}**  In the first assignment of error, father argues that the juvenile court violated his due-process rights by awarding emergency custody to a nonparent without finding imminent harm and by delaying any hearing for more than four months.  In the second assignment of error, father argues that the juvenile court erred as a matter of law by depriving him of due process when it granted emergency custody to a nonparent, ex parte and without notice.  In the third and fourth assignments of error, father appears to argue that the juvenile court was required to make an unsuitability finding before issuing an interim-custody order, and it failed to do so, rending the order void.  Because the first, second, third, and fourth assignments of error all challenge the juvenile court's interim-custody award, they will be addressed together.

**{¶19}**  Juv.R. 10(A) provides that "[a]ny person may file a complaint to have determined the custody of a child not a ward of another court of this state, . . . ." Additionally, Juv.R. 13(A) provides that, "Pending hearing on a complaint, the court may make such temporary orders concerning the custody or care of a child who is the subject of the complaint as the child's interest and welfare may require." Juv.R. 13(A).

**{¶20}**  Under Juv.R. 13(D), "the court may proceed summarily and without

notice under division (A), . . . of [Juv.R. 13], where it appears to the court that the interest and welfare of the child require that action be taken immediately." However, "[w]here the court has proceeded without notice . . ., it shall give notice of the action it has taken to the parties and any other affected person and provide them an opportunity for a hearing concerning the continuing effects of the action." Juv.R. 13(E). "[W]herever possible, the court shall provide an opportunity for hearing before proceeding under [Juv.R. 13(D)]." *Id.*

**{¶21}** Orders entered by the juvenile court under Juv.R. 13 in accordance with the child's best interest are temporary and within the juvenile court's subject-matter jurisdiction under R.C. 2151.23(A)(2). *See Rowell,* 2012-Ohio-4313, at ¶ 19, 22.

**{¶22}** Because such orders are temporary, lasting only during the pendency of the underlying complaint, a final custody determination granting legal custody to a nonparent supersedes any temporary-custody order under Juv.R. 13(A). *See O'Conner v. Stires*, 2017-Ohio-8929, ¶ 12 (12th Dist.). Thus, where the juvenile court has entered a final custody determination, any issue challenging the—now superseded—temporary order is moot. *See C.T.F. v. A.B.M.*, 2024-Ohio-1998, ¶ 33-36 (10th Dist.).

**{¶23}** Here, the juvenile court has entered a final custody determination regarding J.L., so any challenge to the interim-custody order is now moot. Therefore, we decline to address father's first, second, third, and fourth assignments of error.

### B. Fifth Assignment of Error

**{¶24}** In his fifth assignment of error, father argues that the juvenile court erred in "relitigating" his suitability as a parent at the December 4, 2023 hearing as grandmother should not have been given a "second bite at the apple." In other words, he argues that the issue of his suitability was barred by res judicata.

**{¶25}** However, grandmother was not given a "second bite at the apple" to prove unsuitability. The hearing that occurred on August 7 and 8 was pertaining to father's request to be heard on the interim-custody orders under Juv.R. 13. The December 4 hearing was a hearing on the competing custody motions. Thus, father's argument that grandmother was given a second bite at the apple is not supported by the record as suitability for purposes of legal custody was not actually litigated until the December hearing. Therefore, we overrule the fifth assignment of error.

### C. Sixth Assignment of Error

**{¶26}** In his sixth assignment of error, father argues that the juvenile court erred in "sustaining" the magistrate's February 6, 2024 custody determination as the decision rested on "prior custody determinations that were void ab initio," and the unsuitability determination was not supported by the evidence.

**{¶27}** As to the argument that the decision rested on prior custody determinations that were void ab initio, father appears to suggest that the orders in this case were entered without jurisdiction. However, as stated above, the juvenile court has exclusive jurisdiction under R.C. 2151.23(A)(2) "to determine the custody of any child not a ward of another court of this state." "This includes 'custodial claims brought by the persons considered nonparents at law.'" *Rowell*, 2012-Ohio-4313, at ¶ 14, citing *In re Bonfield*, 2002-Ohio-6660, at ¶ 43. Thus, the juvenile court was acting within its subject-matter jurisdiction.

**{¶28}** Father next argues that the juvenile court's unsuitability determination was not supported by the evidence. The juvenile court found that father was unsuitable on two bases: abandonment and detriment.

**{¶29}** This court reviews a trial court's decision on legal custody of a child under an abuse-of-discretion standard. *E.g.*, *In re C.R.*, 2022-Ohio-3540, ¶ 19 (1st

Dist.), citing *In re H.J.H.*, 2019-Ohio-116, ¶ 3 (1st Dist.). An abuse of discretion occurs when "a court exercise[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. A trial court abuses its discretion where its decision "is unreasonable, arbitrary, or unconscionable." *In re C.R.* at ¶ 19, citing *In re H.J.H.* at ¶ 3. "A trial court's decision is unreasonable and may be reversed if it is not supported by competent, credible evidence." *Id.*, citing *In re H.J.H.* at ¶ 3.

**{¶30}** "Abandonment is 'any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child.'" *In re M.H.*, 2023-Ohio-3776, ¶ 42 (1st Dist.), quoting *In re C.R.* at ¶ 20. "'For purposes of [R.C. Chapter 2151], a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.'" *In re C.R.* at ¶ 20, quoting R.C. 2151.011(C).

**{¶31}** Here, father admitted that he had no contact with J.L. for, at least, an eight-year period (the period of 2014 to 2022). This period occurred after he was in court at a hearing on his petition for custody in February 2013. The entry from this hearing provided that father's request was denied and states, "Father acknowledged without any prompting that Mother is more than capable as a parent and that he believes it is in the best interest of the child to remain with her."

**{¶32}** Father testified that he did not "know the standards" at that time and thought that he was required to prove that mother was unfit. He said, "So I didn't feel that I could make her be unfit. So I wanted us to work together." Nevertheless, father testified that he was still spending time with J.L. after the 2013 hearing because he said at the hearing that he "wanted to work together" and hopefully resolve "this." In

essence, he said that he knew he would not prevail in court, so he had to "work something out." He stated, "I guess I was hoping for a resolution, that we would work with each other." During cross-examination, he further said that he addressed the court and "told them specifically I -- I'm not here to make her unfit. I want just parenting time with my daughter and hopefully we can work together. That was what happened." He continued, "I addressed the Court, and I said, This shouldn't be a hearing about this. This should be a hearing about us working together and taking care of the child." He testified, "[B]ut that didn't mean that I did not want to see my child."

{¶33} When father was asked if he was ultimately able to work with mother, he replied, "We were as long as I was including her kids or spending time with her and her children." He continued, "I was trying to get to a point -- initially I was slow-walking the situation and hoping that it would come to the time where we would actually have separate lives with [J.L.]. She was preventing that from occurring." When asked what prevented him from seeing J.L. "over these years," he answered, "The mother and the terms on which -- how she wanted me to interact with [J.L.]."

{¶34} When asked on cross-examination if he felt he "put in the effort" to have a relationship with J.L., father answered, "I believe that I have put in effort. I went for custody. I asked to see her, but what I am not going to do, I'm not going to put myself in the position for confrontation."

{¶35} When father was questioned by the court, the following interaction occurred:

Court:     Okay. So -- so, stating that yes, you agree you didn't have
           a strong in-person bond with [J.L.] -- I think you said that
           several times -- because, if I understand what you're

12

saying, you felt like Mother, you didn't want to meet her conditions, her conditions about how you could have a relationship with [J.L.]?

Father:     No.

Court:      Did you say that?

Father:     No.  I said I didn't have -- and those are two different -- two different things.  I know where you -- where you came up with that.  I know.

When I said the in-person is because I haven't been able to have her, but the reason for the conditions, the mother always wanted me to do family-oriented things, like together.

Court:      That's what I meant.

Father:     Oh, okay.

Court:      So you didn't -- you -- you're saying you weren't allowed to have your own personal one-on-one relationship –

Father:     Right.

Court:      -- with [J.L.] only?

Father:     Right.

Court:      And that's why you didn't have a strong in-person relationship with her?

Father:     Right.

Court:      And that -- that's what you're saying?

Father:     Yes.

Court:      But you're saying you felt like, even though it wasn't a

> strong in-person relationship, you had -- [J.L.] knew who you were?

Father: Yes. I felt like it was -- I felt like me and [J.L.] was going -- I'm just going to be honest with you. You know how you have like a spiritual feeling? I always felt like me and her was going to be together.

{¶36} Thus, based on father's testimony, he went over eight years without seeing or speaking to J.L. because he wanted to avoid confrontation with mother. This supports the juvenile court's finding that father "failed to make an earnest attempt to build a relationship with [J.L.] until after mother's passing."

{¶37} Further, the juvenile court was free to disbelieve father's testimony, particularly when coupled with other witness testimony. *See Reynolds v. Goll*, 75 Ohio St.3d 121, 124 (1996) ("In reaching this decision, we are mindful of the fact that the trial court, after carefully listening to the testimony of the parties and witnesses, is in the best position to judge their credibility and to determine whether a parent has abandoned his or her child.").

{¶38} Paternal grandmother testified on direct examination as to several instances where she was able to see J.L. prior to mother's death. She denied on cross-examination that father knew of these instances. When asked why she didn't "set up anything" for father to see J.L., she replied,

> Because at the time we were communicating. However, [father] was doing other things. And these -- these periods of time, it came up at the spur of the moment. It was as if -- if my granddaughter called, Let's [sic] meet at IHOP, let's meet at McDonald's. So I would hurry up and stop whatever I'm doing and do it, but at that time I know that

[father], he probably was doing something that he couldn't getaway or whatever. So I just jumped and go, because I kept calling. I'm the one that kept, you know, keeping in contact, me and my granddaughter.

**{¶39}** Based on this evidence, and testimony provided by J.L. during the in-camera interview, the juvenile court could conclude that father was not making any efforts to keep in contact with his daughter during the prolonged period in question. Therefore, the juvenile court's abandonment finding is supported by the record. Accordingly, we overrule the sixth assignment of error.

### D. Seventh Assignment of Error

**{¶40}** In his seventh assignment of error, father argues that the juvenile court erred by denying his Civ.R. 60(B) motion without holding a hearing.

**{¶41}** Under Civ.R. 60(B), "[o]n motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(B); [or] (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party . . . ."

**{¶42}** "A trial court abuses its discretion when it does not grant a request for a hearing on a Civ.R. 60(B) motion only 'where the movant alleges operative facts which would warrant relief under Civ.R. 60(B).'" *Fontain v. Sandhu*, 2021-Ohio-2750, ¶ 33 (1st Dist.), quoting *Soc. Natl. Bank v. Val Halla Athletic Club & Recreation Ctr., Inc.*, 63 Ohio App.3d 413, 418 (9th Dist. 1989). "'Operative facts are those which if proven would give rise to a meritorious defense.'" *Id*, citing *Soc. Natl. Bank* at 413. "'The evidentiary materials must present operative facts and not mere general allegations to justify relief.'" *Id.*, citing *Soc. Natl. Bank* at 413.

15

**{¶43}** In his Civ.R. 60(B) motion, father claimed to have "first hand [sic] knowledge" that J.L. was coached and said "untruthful things" regarding father during her in-camera interviews, which shows that grandmother committed "fraud on the court." He further claimed to have evidence that shows that grandmother is not in "good mental health," which is contrary to the juvenile court's findings. Father attached an affidavit to his motion. In the affidavit, he averred that he had video evidence that J.L. lied to the court on August 8, 2023, and that grandmother encouraged her to lie to the court. He further averred that he "obtained direct evidence" that grandmother was not in good mental health.

**{¶44}** These claims fall short of going beyond mere general allegations to justify relief. First, Father does not identify what J.L. allegedly lied about. Thus, he fails to show that this allegation would warrant relief. Further, while father claims to have evidence about grandmother's mental health, father does not assert that this evidence was not available at the time he moved for a new trial and father does not raise any challenge to the trial court's denial of his motion for a new trial. Further, father does not identify how grandmother's mental health would give rise to a meritorious defense.

**{¶45}** Consequently, father failed to show that the trial court abused its discretion in denying his motion for relief without holding a hearing as he failed to allege operative facts that would warrant relief under Civ.R. 60(B). Therefore, we overrule the seventh assignment of error.

### III. Conclusion

**{¶46}** For the foregoing reasons, we decline to address father's first, second, third, and fourth assignments of error as moot, overrule the fifth, sixth, and seventh assignments of error, and affirm the judgments of the juvenile court.

Judgments affirmed.

**NESTOR** and **MOORE, JJ.,** concur.